**BELL & HOWELL : MAMIYA CO., Plaintiff,**

v.

**MASEL SUPPLY CO., Defendant.**

**No. 81 CV 2446 (ERN).**

United States District Court,
E. D. New York.

Sept. 30, 1982.

Wallenstein, Wagner, Hattis, Strampel & Aubel, Chicago, Ill. by Robert E. Wagner, Robert E. Browne, and Pennie & Edmonds, New York City by John E. Kidd, Joseph J. C. Ranalli, Robert M. Kunstadt, New York City, for plaintiff.

Nims, Howes, Collison & Isner, New York City by Kenneth R. Umans, New York City, for defendant.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This trademark case brings into sharp focus the commercially significant question of whether an American company, which is engaged on an exclusive basis in the business of importing and selling trademarked goods of foreign manufacture under United States trademark rights owned by it, may enjoin another's unauthorized, competitive sale in the United States of the same identically trademarked goods, which were made and placed in the stream of international commerce by the foreign man-

ufacturer, who did not intend that such goods be sold here. The action is now before the Court on plaintiff's motion for a preliminary injunction, following the issuance of a temporary restraining order, which has remained in effect with the consent of the parties. Based upon the facts which do not appear to be seriously disputed, the Court is of opinion that a preliminary injunction should be granted.

■ Plaintiff, formerly named Bell & Howell : Mamiya Company, and now named Osawa & Co., is a Delaware corporation.[1] It is the registered owner of United States trademark registrations for three "MAMIYA" marks,[2] and, on a purportedly exclusive basis, it imports and sells in this country medium format[3] photographic equipment under these marks. The equipment is manufactured in Japan by the Mamiya Camera Co. ("Mamiya Co."), a Japanese company, sold by Mamiya Co. to a Japanese trading company, J. Osawa & Co. Ltd. ("Osawa Japan"), and then sold by the latter to plaintiff.

By agreement with Mamiya Co., Osawa Japan holds the exclusive right to distribute MAMIYA medium format equipment worldwide, except in Japan, which Mamiya Co. has reserved for itself. By a further oral agreement with plaintiff, Osawa Japan has named it the exclusive American distributor of these cameras. Osawa Japan owns all of the stock of Osawa & Co. (USA), Inc. ("Osawa USA"), a New York corporation which owns 93% of plaintiff's stock. Mamiya Co. of Japan holds the remaining 7%.

It appeared from the papers, and is now established that defendant Masel Supply Co. and another company had imported from Hong Kong (without opposition by U. S. Customs) non-counterfeit MAMIYA medium format cameras which they purchased from someone other than plaintiff and then resold in the United States, without authorization from plaintiff. There is no question that the equipment sold by defendant was made by Mamiya Co. and distributed by Osawa Japan. Defendant simply contends that no likelihood of confusion, dilution or unfair competition can arise from its sales of imported MAMIYA cameras in competition with plaintiff's sales of the same goods.

Despite the importance of the question raised, there are only a few certain landmarks. These are Justice Holmes' brief decision for the Supreme Court in *A. Bourjois & Co. v. Katzel Co.,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), *rev'g,* 275 F. 539 (2d Cir. 1921), *rev'g,* 274 F. 856 (S.D.N.Y.1920), and the two congressionally imposed restrictions on the importation of trademarked goods contained in the Act of September 21, 1922, ch. 356, title iv, § 526, 42 Stat. 975, *superseded by* section 526 of the Tariff Act of 1930 (codified at 19 U.S.C. § 1526), and in section 42 of the Lanham Act (codified at 15 U.S.C. § 1124). Understandably, these have been subjected to extremely close scrutiny by practitioners and scholars, who have expressed widely divergent views about their significance. With the important exception of *United States v. Guerlain, Inc.,* 155 F.Supp. 77 (S.D.N.Y. 1957), *vacated and remanded,* 358 U.S. 915, 79 S.Ct. 285, 3 L.Ed.2d 236 (1958), *action dismissed,* 172 F.Supp. 107 (S.D.N.Y.1959), the legal journals have been the main battleground. Now this case has brought the sufficiency of those views to the fore.

---

1. During the pendency of this motion the operations of plaintiff's immediate parent, Osawa & Co. (USA) Inc., were transferred to plaintiff. The decision was made at this time to change plaintiff's name to Osawa & Co., in view of the limited time of plaintiff's right to use "BELL & HOWELL" as part of its corporate name.

2. The trademarks are: "MAMIYA," U.S. Reg. No. 785,979, "MAMIYA–SEKOR," U.S. Reg. No. 795,165, and "MAMIYA C," U.S. Reg. No. 812,970. The registrations, copies of which were attached to the complaint, are all valid, and constitute *prima facie* evidence of plaintiff's ownership and exclusive right to use the MAMIYA marks *in connection with the sale of photographic equipment.* *See* 15 U.S.C. §§ 1057(b); 1115(a).

3. Medium format photography equipment is designed for use by professionals and advanced hobbyists. The market for these cameras is far smaller than that for 35mm. equipment or other simple to use consumer cameras.

In essence, plaintiff relies on the fact that it is the registered owner of the United States trademark registrations for the MAMIYA marks and on an unrestrictive reading of *Bourjois v. Katzel, supra.* Apart from its particular facts, the significance of which has fueled much of the debate, the *Bourjois* decision undeniably established for American trademark law the principle of the territoriality of trademarks, *viz.,* that

> "the protection of a trademark in a certain country depends exclusively on the law of that country, and that the effects of a trademark ownership by use or registration in a country do not reach beyond the borders of that country," II S. Ladas, Patents, Trademarks, and Related Rights 1340 (1975),

and thus rejected the principle of trademark "universality" which the Second Circuit had sustained in decisions going back to *Appollinaris Co., Ltd. v. Scherer,* 27 F. 18 (C.C.S.D.N.Y.1886). Under the "universality" principle, goods manufactured abroad under a trademark and then imported and sold in the United States were held not to infringe the rights of the owner of the American trademark, simply because the goods were genuine and the public, therefore, was undeceived. In *Bourjois v. Katzel* the Supreme Court held that an exclusive American distributor of a foreign-made, trademarked product, who possessed the American trademark rights by assignment from the foreign manufacturer, could maintain an infringement suit against one who imported and sold the foreign manufacturer's product under the trademark in competition with the plaintiff.[4]

Defendant acknowledges the continued validity of *Bourjois v. Katzel,* but focusing on its facts, and one in particular, contends that the case does not render the situation here a true case of trademark infringement. Defendant points out that the plaintiff in *Bourjois v. Katzel* was apparently unconnected with the foreign manufacturer and originator of the trademark, beyond having

been the manufacturer's exclusive American distributor and having acquired from it the American trademark rights. Defendant contrasts this with the more extensive affiliations that exist among plaintiff, its ultimate parent Osawa Japan, and Mamiya Co., which relate to the manufacture and worldwide distribution of MAMIYA medium format photographic equipment. Piercing the "veils" of Osawa USA's 93% ownership of plaintiff and Osawa Japan's sole ownership of Osawa USA, it argues in essence that where the American trademark owner is subject to common ownership or control with the owner and users of the trademark in foreign nations, or forms part of a unified international enterprise engaged in the production and worldwide distribution of the trademarked product—descriptions it urges fit plaintiff—there can be no likelihood of confusion, false designation of origin, dilution or unfair competition for which relief can be granted.

For support, defendant relies on the reasoning of the district court in *United States v. Guerlain, Inc., supra,* which upheld the government's antitrust, Sherman Act § 2 monopolization claims against three trademark owners who were the exclusive United States distributors for three French perfumers, and who utilized the customs statute, 19 U.S.C. § 1526, *supra,* to block the importation of perfumes from the French companies to which they were related. Defendant also draws on the somewhat similar reasoning apparent in the United States Customs Service's current interpretation and administration of the related customs and trademark laws, 15 U.S.C. § 1124 and 19 U.S.C. § 1526, which are directed against the importation of foreign-made goods bearing trademarks registered in the United States. 19 C.F.R. Part 133 (1980). *See* J. Atwood, Import Restrictions on Trademarked Merchandise—The Role of the United States Bureau of Customs, 59 T.M.R. 301 (1969).

---

**4.** *Bourjois v. Katzel* is still cited for this holding. *E.g., Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 158–59 (1st Cir. 1977)

(dictum) (Miller, J., C.C.P.A., sitting by designation).

In this connection, defendant points out that in 1979 plaintiff was incorporated in Delaware as the business successor to a now-dissolved Illinois partnership of the same name, which distributed MAMIYA and BELL & HOWELL consumer photographic equipment in this country from 1975–1979. The partners in plaintiff's predecessor and their respective shares were Bell & Howell Company (50%), Mamiya Marketing Inc. (17%) and Osawa Marketing Inc. (33%). In 1979, Bell & Howell decided to withdraw from its consumer photographic lines of business and conveyed its share of the partnership's business to its Osawa and Mamiya partners, which then were merged to create plaintiff. As part of the transaction, Bell & Howell assigned ownership of the MAMIYA trademarks from itself to the newly formed marketing company, plaintiff. It also licensed Osawa Japan to sublicense the BELL & HOWELL mark for use on consumer photographic equipment, and plaintiff to use "BELL & HOWELL" as part of its corporate name.

As a result of the merger, Mamiya Marketing's parent, the manufacturer, Mamiya Co., received 15% of plaintiff's stock and Osawa Marketing's parent, Osawa USA, received 85%. Osawa USA itself was wholly owned by Osawa Japan, the exclusive distributor of MAMIYA products outside Japan. A subsequent conversion of debt to equity raised Osawa USA's stake in plaintiff to 93% and diluted Mamiya's to 7%.

Besides these stock ownership ties between plaintiff and the two Japanese companies that together manufacture and distribute the medium format cameras in which plaintiff and defendant deal, three of the six seats on plaintiff's board of directors are filled by directors of Osawa Japan, including its president Zenro Osawa, and the president of Osawa USA. A fourth seat is held by the president of Mamiya Co. In addition, plaintiff has received financial help from Osawa Japan in the form of a direct loan later converted to equity, and guarantees on bank loans in this country and the long term lease on its new headquarters in Illinois. Plaintiff has also sent frequent status and financial reports and

projections directly to Osawa Japan without going through its immediate parent Osawa USA, and has regularly bypassed the latter in dealing with Osawa Japan.

Defendant points out further that Osawa USA and plaintiff file consolidated tax returns. Also, for purposes of authorizing sublicenses of the BELL & HOWELL trademark, which Osawa Japan is authorized to issue under its license for that mark, Osawa Japan has treated its sole ownership of Osawa USA and the latter's 95% ownership of plaintiff as the equivalent of a 50% or greater direct ownership in plaintiff.

It is an integral part of plaintiff's United States distributorship arrangement that it purchase all its requirements from Osawa Japan, with no option to return unsold equipment or overstocked inventory. In practical terms, plaintiff cannot buy MAMIYA format products from anyone but Osawa Japan, including Mamiya itself or defendant's Hong Kong dealer. Furthermore, plaintiff is aware of Osawa Japan's exclusive distributorship arrangement with Mamiya and would not disrupt that arrangement by purchasing directly from Mamiya or by exporting MAMIYA products from the United States.

Osawa Japan and Mamiya have no officers or directors in common, although Osawa Japan owns over 30% of Mamiya's stock. This figure is substantially greater than the 18% combined holdings of the four next largest shareholders, none of whom holds more than 6%. Osawa Japan does possess, however, the exclusive right to distribute Mamiya's products worldwide outside Japan, and by oral agreement it has designated plaintiff the exclusive distributor for the United States.

Besides arguing that in these circumstances no likelihood of confusion, dilution or unfair competition is engendered by its competition with plaintiff in selling identical, non-counterfeit equipment, defendant disputes the propriety of injunctive relief on antitrust grounds. It contends that the control Osawa Japan assertedly exercises over plaintiff turns the latter's trademark

rights into a vertical, territorial restraint on the worldwide flow of medium format camera equipment. Defendant argues that whether plaintiff achieves this restraint on its own, or through a conspiracy or other agreement with Osawa Japan and Mamiya Japan, it is unlawful under the antitrust laws, and therefore grounds for denying injunctive relief under the equitable doctrine of clean hands, as well as the trademark laws. Cf. 15 U.S.C. § 1115(b)(7) (antitrust violation a defense to the incontestability of a trademark).

In this connection, evidence has been adduced that the ultimate market for medium format equipment is limited, comprising professional photographers and advanced hobbyists, and much smaller than that for 35mm. and other popular consumer cameras, which are directed primarily to first-time camera users. Four other medium format brand name cameras are available: Hasselblad, Rollei, Pentax and Bronica. Only one camera, a Pentax model, approximates the MAMIYA medium format cameras in both price and quality, but its sales levels are more than 40% below those of the MAMIYA cameras. Two Bronica models are about the same price but according to plaintiff are of lower quality. While plaintiff considers its two medium format models to be of the same quality as the Rollei and Hasselblad models, the latter are over 35% more expensive than the MAMIYA cameras. There is no evidence, however, as to the relative sales between the MAMIYA cameras and other medium format models except for the Pentax, or whether changes in price of any of them would result in changed sales volume.

Plaintiff naturally opposes defendant's attempts to pierce the corporate veil between it and Osawa Japan, and to lump it, Osawa Japan and Mamiya Co. into a single international economic unit engaged in the manufacture and worldwide distribution of MAMIYA medium format cameras. It asserts that the business of importing and selling MAMIYA medium format equipment in the United States belongs to it, not Osawa Japan, notwithstanding the close corporate ties between them, and on that

basis insists that the use of the identical MAMIYA marks on its goods and defendant's can only be considered confusingly similar and damaging to plaintiff.

Plaintiff points out that it determines the terms and conditions of the warranty it offers on the MAMIYA cameras it sells. It arranges for changes to be made in the printed warranty form by submitting them to Osawa Japan, which then transmits them to Mamiya. An English language instruction booklet and warranty card are included with each camera plaintiff distributes. The warranty card identifies plaintiff as the warrantor, provides a limited one-year warranty and gives the address of plaintiff's principal place of business as 1 Mamiya Drive, Mt. Prospect, Illinois. The booklet and card both state they are printed in Japan and were placed with the equipment at the point of original packing at the Mamiya factory in Japan. Although plaintiff purchases its cameras through Osawa Japan, Mamiya reimburses plaintiff directly for warranty repairs, rather than indirectly through Osawa Japan. Reimbursement, however, is made only "partially."

By its warranty, plaintiff has undertaken the responsibility of servicing all MAMIYA equipment it distributes throughout the United States. The end purchasers arrange for warranty service either through the retail distributor or directly with plaintiff. Additionally, plaintiff has expended substantial sums in advertising MAMIYA products and establishing a nationwide dealer network. In 1980 alone it spent between five and six million dollars for these purposes.

Defendant sells its MAMIYA medium format equipment just as it is received from Hong Kong, without repackaging or identification stickers. The packaging is identical to plaintiff's except for the stickers, but no product warranty is included. Instead, in addition to an English language instruction booklet, there is an insert in English listing facilities that service MAMIYA products worldwide. The back of this insert bears Osawa Japan's business name,

and the listing includes addresses for plaintiff in New York, California and Illinois. Such a list is not included with the MAMI-·YA medium format equipment plaintiff sells.

. Defendant solicits its medium format camera sales largely by word of mouth, in part because the prices and types of cameras it can offer at any time vary greatly. Most of defendant's customers are located in the New York metropolitan area and several are owned by persons related to defendant's owners by blood or marriage.

Although the setting of this case is the international distribution of goods, it is fundamentally an action for infringement of United States trademark rights. Before reaching the critical issues presented, it will be helpful to consider briefly some commonly accepted principles of American trademark law.

▮ First, a trademark performs a number of related but distinct functions. It identifies the goods to which it is affixed as those of a single, albeit anonymous source, and distinguishes them from the similar goods of others. Through use, a trademark becomes a guaranty that the goods sold under it meet a particular standard of quality. And the mark itself can become a potent advertising symbol, motivating buyers to purchase products with which it is marked. *See generally,* 3 R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies, § 65, passim (3d ed. 1969); 1 J. Gibson, Trademark Protection and Practice, § 1.03 (1978).

Goodwill is a term commonly used to describe the advantage that accrues to a business from the successful functioning of a trademark. An intangible asset, the goodwill of a business has long been considered entitled to special legal protection from acts, typically those of actual or potential competitors, which injure or detract from its value. Such protection is supposed to further the functioning of a competitive market economy.

▮ It is axiomatic that goodwill is acquired by the carrying on of a business. So,

too, trademarks receive protection only because, and when, they are used in a business. In Justice Pitney's phrasing,

"there is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trademarks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business. *Hanover [Star] Milling Co. v. Metcalf,* 240 U.S. 403, 412–414 [36 S.Ct. 357, 360, 60 L.Ed. 713]." *United Drug Co. v. Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918).

With some refinements, this view remains the law today. It is reflected, for example, in the Lanham Act provision, § 10, governing trademark assignments:

"A registered mark . . . shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark, and in any such assignment it shall not be necessary to include the goodwill of the business connected with the use of and symbolized by any other mark used in the business or by the name or style under which the business is conducted." 15 U.S.C. § 1060.

▮ Trademarks traditionally are said to identify a single "source of origin" of goods. *E.g., Clairol Inc. v. Gillette Co.,* 389 F.2d 264, 269 (2d Cir. 1968). This "source" or origin, however, is not necessarily the product's manufacturer. It has long been settled that a merchant can own a trademark and receive protection for its use on a product he did not manufacture. *Menendez v. Holt,* 128 U.S. 514, 520, 9 S.Ct. 143, 144, 32 L.Ed. 526 (1888); *McLean v. Fleming,* 96 U.S. 245, 254, 24 L.Ed. 828 (1877); *see American Trading Co. v. H. E. Heacock Co.,*

285 U.S. 247, 52 S.Ct. 387, 76 L.Ed. 740 (1932).

■ In such circumstances, the term "origin" denotes the party responsible for exercising judgment respecting the quality of the goods it distributes to the public. Again, this principle is expressly reflected in the Lanham Act's definition of a "trademark" as

"any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer *or merchant* to identify his goods and distinguish them from those manufactured *or sold* by others." 15 U.S.C. § 1127 (emphasis added).[5]

■ Where the mark a merchant uses in this country is one that a foreign manufacturer or merchant has originated or used on the very goods the merchant imports and sells here, protection can still be accorded the merchant if it is the registered owner of the trademark. This result follows from the principle of territoriality previously mentioned in connection with *Bourjois v. Katzel, supra. See American Trading Co. v. H. E. Heacock Co., supra; cf.* 15 U.S.C. § 1126(f) (registration of a mark registered under Lanham Act by a person of foreign origin in the foreign country, "shall be independent of the registration in the country of origin"); *see also Ingenohl v. Olsen & Co.*, 273 U.S. 541, 543–44, 47 S.Ct. 451, 452, 71 L.Ed. 762 (1927); *George W. Luft Co., Inc. v. Zande Cosmetic Co.*, 142 F.2d 536, 540, 541 (2d Cir. 1944). Conceptually, the principle that protection of a trademark in a particular country depends on the laws of that country and not on the continued effect of the laws of another sovereign readily supports the existence of separate goodwills pertaining to the same trademark, in conjunction with the business carried on in separate countries, for example, manufacture and distribution, each symbolized by a trademark registration.

■ Before an issue of infringement can be considered, however, it must be es-

tablished that the party seeking judicial relief is the owner of the trademark in suit. In this country the right to sue for infringement (though not for false designation of origin under 15 U.S.C. § 1125(a)) is limited to a "registrant," 15 U.S.C. § 1114(1), and only the "owner" of a mark may register it. *See* 15 U.S.C. § 1051.

In *Scandinavia Belting Co. v. Asbestos & Rubber Works*, 257 F. 937 (2d Cir. 1919), *cert. denied*, 250 U.S. 644, 39 S.Ct. 494, 63 L.Ed. 1186 (1919), the Court of Appeals held that an exclusive American distributor of foreign-made goods who also possessed an exclusive license to use the foreign manufacturer's mark in the United States, irrevocable for a term of years, was entitled to register the mark as a "special" owner. In a concurring opinion, Judge Ward emphasized the critical nature of the relationship between the foreign manufacturer and the United States distributorship with respect to the imported, trademarked goods:

"If the plaintiff company is merely the exclusive agent of the English company to sell its product in this country for its benefit upon a fixed commission or for any sum it can get in excess of a fixed price, I think the English company [the manufacturer] is the owner, both of the trademark and of the business to be protected, and is alone entitled to register the trademark and to sue for infringement of it or for unfair competition here. . . .

"On the other hand, if the plaintiff company purchases the English company's product outright and sells it for its own benefit, and is given the exclusive right to do so in this country, together with the right to use the trademark for that purpose which has come to indicate the plaintiff company as the source and origin of the goods, then the business to be protected is the plaintiff company's business, and it has the right to register the trademark under the United States statute and to sue for infringement of it." 257 F. at 962.

---

5. The term "merchant" is not restrictive, and therefore plainly embraces vendors at all stages in the chain of distribution from a manufactur-

er: retailers, wholesalers, jobbers, distributors and importers.

*Cf. In re North American Import Bedding Inc.,* 158 USPQ 164 (1968) (distributor of Swiss manufactured goods under terminable agreement not entitled to registration of manufacturer's trademark where no evidence of exclusivity).

 The theory of trademark protection has been traced to the tort of passing off the goods of one seller as those of another. This concept has continued as the core of the modern test for trademark infringement, *viz.,* whether another's unauthorized

> "use in commerce [of] any reproduction, counterfeit, copy or colorable imitation of a registered mark· in connection with the sale, offering for sale, distribution, or advertising of any goods or services ... is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).

Prior to a 1962 amendment, the statute explicitly required a showing that the reproduction would "deceive purchasers as to the *source of origin* of such goods or services." *Id.* (emphasis added). Recognizing that trademarks serve as an assurance of quality, and thus indicate more than the physical "origin" of the goods on which they are used, Congress eliminated the "source of origin" language as too likely to cause narrow interpretations of the statute. Congress wanted to make ·it clear that trademark imitations which caused confusion as to the identity of the company which stands behind or insures the quality of trademarked goods would be actionable under the statute. *See Syntex Laboratories v. Norwich Pharmacal Co.,* 437 F.2d 566 (2d Cir. 1971).

Under the guise of trademark "universality," just such a narrow interpretation of trademark infringement was adopted with respect to imported goods during the four decades preceding Justice Holmes' 1923 decision in *Bourjois v. Katzel.* Those decisions focused on the fact that the goods sold by both parties came from the ultimate manufacturing source, thereby ignoring the possible existence of a separate American goodwill belonging to the plaintiff, typically an exclusive distributor for the foreign company's products. As Judge Hough observed in his dissent from the Circuit Court decision in *Bourjois v. Katzel, supra,* the leading decisions on the issue of imported goods seemed premised on the concept that a trademark functioned primarily to protect the public from the evils assumed to inhere in imitation goods passed off as the genuine article, rather than to protect the trademark owner's business from a species of unfair competition. *See* 275 F. at 543–44 (Hough, J., dissenting). It was for that reason, it would appear, that the cases were overruled, first by Congress when it enacted the predecessor of 19 U.S.C. § 1526, and then by the Supreme Court in *Bourjois v. Katzel.*

Thus, in *Appollonaris Co., Ltd. v. Scherer, supra,* the court refused to enjoin the defendant's sale of imported bottled water under the HUNYADI ·JANOS trademark even though the plaintiff had the sole right to use the mark in the United States. The water defendant sold came from the same spring as plaintiff's. The court reasoned that

> "the ·defendant is selling the genuine water, and therefore the trade-mark is not infringed. There is no exclusive right to the use of a name or symbol or emblematic device except to denote the authenticity of the article with which it has become identified by association." 27 F. at 20.

The first legislative treatment of the question came with passage of § 27 of the Trademark Act of 1905, 33 Stat. 730 (1905), but its enactment had no impact on the judiciary's viewpoint. Section 27 barred "entry at any custom house of the United States" to any "article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of this act." Construing this provision in *Fred Gretsch Mfg. Co. v. Schoening,* 238 F. 780 (2d Cir. 1916), the Court of Appeals adhered to the pre-enactment *Appollonaris* holding. The plaintiff's mark "Eternelle" for violin strings which were made in Germany and which it had

the exclusive right to import, was determined not to have been "copied or simulated" by one who had bypassed the plaintiff and bought genuine Eternelle strings in Germany, brought them to America and then sold them here so marked. Said the court:

> "The act prohibits entry of imported merchandise which shall 'copy or simulate' a trade-mark registered under it. The obvious purpose is to protect the public and prevent anyone from importing goods identified by their registered trade-mark which are not genuine." 238 F. at 782.

In *Bourjois v. Katzel, supra,* plaintiff had purchased for $400,000 the United States trademark rights to "JAVA", a mark then owned by a French manufacturer of face powder, together with the sole and exclusive right to make and sell the trademarked powder in the United States. For many years previously, the plaintiff had been selling JAVA powder in boxes which described plaintiff as the distributor for the French firm. After the sale, plaintiff continued to purchase and import the French firm's powder in bulk, but packed it and distributed it here in its own boxes. These differed from those of the French concern in identifying only the American firm, the notation that the boxes were "packed in U.S.A.", and the elimination of the phrase "de Riz" following the word "Poudre."

The defendant imported and sold in this country the French concern's powder, packed in the French company's boxes, that were virtually identical to plaintiff's. The district court enjoined the sale. It found that "the boxes of face powder ... under consideration are associated in the public mind with the plaintiff corporation." 274 F. 856, 857 (S.D.N.Y.1920). It was unimportant to the court that the defendant bought its powder from the same source as the plaintiff, because through ownership of the mark and its accompanying goodwill, the court believed that plaintiff "could buy from any source, and still succeed, so long as it satisfied the public."

The district court distinguished the *Gretsch* case as one involving importation

of actual genuine goods, as opposed to the situation it believed it was confronting, where the original owner of the business and its trademarks had transferred them outright, but nevertheless continued sales to importers in the United States. The Circuit Court disagreed with the distinction. Framing the question as "whether the defendant has not the right to sell this article under the trade-marks which truly indicate its origin," 275 F. at 540, the court reiterated the principle it had stated in *Gretsch,* and concluded that if the claimed infringing goods were the same genuine goods the plaintiff sold under the trademark, "the rights of the owner of the trade-mark are not infringed." *Id.* at 543. And the majority emphasized that the plaintiffs in *Appollonaris* and *Gretsch* had also been true trademark owners, and not mere selling agents. *Id.* at 541–43.

Dissenting, Judge Hough considered the "primary function" of trademarks to be to protect the owner's "business in his own country." Like the district court, he believed that it was irrelevant that defendant sold the genuine French powder. "That genuine article has become an infringement because the business of dealing in that article within the United States is the plaintiff's business," *id.* at 544 (Hough, J., dissenting), symbolized by the trademarks that had been assigned to it.

After a two-year interval, during which Congress acted to remedy the injustice it perceived in the Court of Appeals' ruling, the Supreme Court reversed the Second Circuit and upheld the plaintiff's right to enjoin further sales. It made no mention of Congress' action, which had concerned the power to block importation.

In its decision the Court first emphasized the factual indicia of the plaintiff's status as trademark owner. Thus, it observed that plaintiff "uses care in selecting colors suitable for the American market, in packing and in keeping up the standard, and has spent much money in advertising, etc., so that ... the labels have come to be understood by the public here as meaning goods coming from the plaintiff," 260 U.S. at 691,

43 S.Ct. at 245, a point reinforced by the markings which the plaintiff employed on its boxes.

Turning next to matters of law, however, the Court then stated that it "plainly follow[s] from the statute authorizing assignments," that "[a]fter the sale the French manufacturers could not have come to the United States and have used their old marks in competition with the plaintiff." *Id.* Whether or not the foreign manufacturer ever purported to authorize sale under its old label by agreement with another in a deliberate attempt to evade the transfer, the defendant's sale of the French concern's trademarked goods became an infringement because "the vendors could not convey their goods free from the restriction to which the vendors were subject." *Id.* at 692, 43 S.Ct. at 245.

Analogizing to goods manufactured under foreign counterpart patents which cannot be sold in the United States without infringing the United States patent, *id.* at 691, 43 S.Ct. at 245, the Court clearly based this reasoning on the principle of territoriality. "Ownership of the goods does not carry the right to sell them with a specific mark. It does not necessarily carry the right to sell them at all in a given place." *Id.* at 692, 43 S.Ct. at 245. While the patent monopoly is "more extensive" because it excludes all similar goods, of whatever brand, the Court found "no sufficient reason for holding that the monopoly of a trademark, so far as it goes, is less complete." *Id.*

Lastly, the Court rejected as "not accurate" the argument that "the trademark here is that of the French house and truly indicates the origin of the goods." On the contrary, by virtue of the assignment as well as the plaintiff's activities, the trademark was clearly that "of the plaintiff only in the United States and *indicates in law,* and, it is found, by public understanding that the goods come from the plaintiff although not made by it. It was sold and could only be sold with the goodwill of the business that plaintiff bought." *Id.* (emphasis added).

As a sequel the following term, in *A. Bourjois & Co., Inc. v. Aldridge,* 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (*per curiam*), the Court overturned the *Gretsch* court's construction of § 27 of the 1905 Act on the authority of *Bourjois v. Katzel,* again without referring to Congress' still recent legislation. In this case, the Bourjois company had challenged the refusal of the Collector of the Port of New York to bar importation of a different face powder also sold under a mark that had been assigned to the plaintiff by the same French concern. As in *Katzel,* the French manufacturer had continued to sell the powder under its own mark in France, which the plaintiff's competitors sought to import. The Court held that the defendant's sale of the genuine French powder in the French concern's boxes infringed the plaintiff's mark, and § 27 therefore required the Collector to exclude such powder from entry. *Id.* at 676, 44 S.Ct. at 4.

The significance of the Supreme Court's two *Bourjois* decisions has become obscured; consideration of them has become inextricably involved with the Congressional legislation enacted to remedy the problem typified by the Circuit Court's *Katzel* decision. Congress' solution, § 526 of the Tariff Act of 1922, was enacted one year before the Supreme Court's *Bourjois* decisions. The statute was amended slightly and re-enacted as § 526 of the Tariff Act of 1930. It was further amended in 1978 to deal with the matter of tourist imports, and is presently codified at 19 U.S.C. § 1526.

In subsection (a) it provides that

"it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States . . . and if a copy of the certificate of registration of such trademark is filed with the Secretary of the Treasury . . . unless written

consent of the owner of such trademark is produced at the time of making entry."

Subsections (b) and (c) provide that merchandise imported into the United States in violation of the Act shall be subject to seizure and forfeiture, and that any person dealing in such merchandise may be subjected to penalties "under the provisions of" the trademark statute. These include being enjoined from dealing in the embargoed goods within the United States, held liable for the damages and profits awarded against wrongful use of trademarks, or being required to export or destroy the merchandise or remove the trademark.

After the decision in *Bourjois v. Aldridge, supra,* two statutes thus barred importation of goods bearing marks registered in the United States Patent Office under federal trademark acts. Section 27 of the Trademark Act of 1905 was available to bar importation of goods bearing a name which "shall copy or simulate" a registered trademark. In more specific terms, § 526 outlawed the importation of "merchandise of foreign manufacture" which bore a trademark owned by an American citizen. Section 526 also specifically added seizure and forfeiture at the customs house to the trademark law remedies against the importation of infringing goods.

The proper construction of § 526 has been a controversial issue. The Customs Service, entrusted with enforcement of both these provisions, has advanced a variety of views concerning the circumstances under which the importation remedies may be legitimately invoked. In keeping with the clear language of § 526, the Bureau originally ruled in 1936 that merchandise manufactured under a foreign trademark outside the United States would not "copy or simulate" an identical United States mark if the "same person" owned both marks. T.D. 48,537 (1936). The Bureau, however, effectively rewrote § 526 when it amended its regulations in 1953. These new regulations made § 526 remedies unavailable not only where the foreign and United States trademarks were owned by "the same person, partnership, association or corporation," but

also when the trademarks were owned by "a *related* company as defined in Section 45 of the Trademark Act of 1946." 19 C.F.R. § 11.14(b) (1954). Section 45 defines a "related company" as "any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark [registered in the United States] is used." 15 U.S.C. § 1127. *See generally,* J. Atwood, Import Restrictions on Trademarked Merchandise, *supra.*

In conjunction with the Customs Bureau's administrative attempt to cut back on the implementation of § 526, the Department of Justice invoked § 2 of the Sherman Act in an effort to confine § 526 solely to the protection of independent American trademark owners. *See* R. Bicks, Antitrust and Trademark Protection Concepts in the Import Field, 49 Trademark Rep. 1255, 1257 (1959). Thus, in 1956, the Department of Justice filed complaints against 4 American toiletry concerns charging them with monopolizing and attempting to monopolize the importation and sale of toilet goods bearing their trademarks. *United States v. Guerlain, Inc., supra.* Theorizing that any invocation of § 526 prevents imports from being a competitive check on prices American companies can charge, the Department of Justice apparently considered it particularly objectionable where all the channels of trade appeared to be controlled by an international enterprise. *Id.* The government was initially successful. It persuaded the district court that it was unlawfully exclusionary conduct for Guerlain and its fellow distributors and trademark owners to use § 526 to bar importation of identical trademarked goods that had been already sold abroad by the foreign part of the "single international business enterprise" of which the court found each American distributor to be a part. On appeal, however, the Supreme Court vacated the district court's order.

Undoubtedly, the subsequent vacatur of the *Guerlain* decision undermined its precedential force. Nevertheless, it cannot be

ignored. Defendants here have adopted its approach, and one commentator from the Customs Service observed, the "opinion is the only judicial reasoning directly in point and it was not repudiated on its merits." J. Atwood, Import Restrictions, *supra,* 59 T.M.R. at 316.

While in each instance the precise relationship varied, the district court found in *Guerlain* that each American trademark owner and distributor was affiliated with a French manufacturer and supplier in such a manner as to warrant the finding that the two were simply component "parts of a single international enterprise." 155 F.Supp. at 89, 93, 96. Each American distributor owned United States registrations for the perfumery's house mark as well as for particular brands. The court found that each of the separately trademarked toilet goods was substantially identical in character and quality whether prepared and sold abroad or in the United States. Each American company had deposited with the Customs Service certificates of the registrations of the house and individual brand trademarks, for the purpose of preventing competitive importation of the identically trademarked products.

In ruling in favor of the government on its § 2 charges, the court held that § 526 "does not apply to the American part of a single international enterprise to enable it to prevent the importation into the United States of authentic products sold abroad by the foreign part of the enterprise." 155 F.Supp. at 80. Obviously conscious of "the absence of specific language to that effect in the legislation," *id.,* the court advanced two main reasons to support its construction: "the litigated history of the issue involved and the legislative history of the section," *id.,* and the determination drawn from its view of the merits of the § 2 charges, that a literal construction of § 526 upholding the business arrangements the defendants had devised amounted to an unwarranted, implied exception to § 2 of the Sherman Act. *See* 155 F.Supp. at 83. Nevertheless, this Court's own examination of those grounds has afforded sufficient reason to decline to follow *Guerlain's* narrow reading of *Bourjois v. Katzel* and § 526.

In the *Guerlain* court's view the limited Senate debate on § 526 indicated an exclusive purpose to protect American trademark purchasers in the precise situation as the Bourjois company—an independent distributor being undermined unfairly in its newly acquired business by its assignor's continued sales of the foreign trademarked product to other importers. Speaking in support of the bill one senator declared that

"all that [it] does is to prevent fraud, and I believe that the Senate is in favor of protecting the property rights of American citizens who have purchased trademarks from foreigners, and when those foreigners deliberately violate the property rights of those to whom they have sold their trademarks by shipping over to this country goods under the identical trademarks." 62 Cong.Rec. 11603 (remarks of Sen. Sutherland).

And there are other references in the Senate discussion to making assignors live up to their contracts. *E.g., id.* at 11602.

Concededly, the statements indicate that the plight of trademark assignees in the Bourjois Company's situation was a special concern to Congress. It bears noting, however, that the factual situation was partially misrepresented by the bill's proponents. The French assignor was not shipping goods to the United States to compete with those of the assignee. All it had done was to sell its goods abroad to another who did so. Nevertheless, the possibility that individual senators may not have understood precisely how the Bourjois Company's American trademark rights were being encroached upon cannot weigh heavily in construing the statute when the breadth of the language used in the legislation is properly considered.

■■■ First, the plain meaning of the words Congress has selected is ordinarily conclusive of the scope of a statute. *United States v. Clark,* —— U.S. ——, 102 S.Ct. 805, 809, 70 L.Ed.2d 768 (1982). Section 526 conferred upon citizens of the United

States, including corporations created here, the right to bar importation generally. The language does not reasonably admit of a special limitation based upon foreign ownership of an American company. An American subsidiary of a foreign company is no less American for being a foreign company's subsidiary.[6]

■ Furthermore, the Act "was intended only to supply the casus omissus, supposed to exist in section 27 of the Act of 1905 ... because of the decision of the Circuit Court of Appeals in *Bourjois v. Katzel.*" *Coty Inc. v. Le Blume Import Co.,* 292 F. 264, 269 (S.D.N.Y.) (L. Hand, J.), aff'd, 293 F. 344 (2d Cir. 1923). The *Guerlain* court itself emphasized this point. 155 F.Supp. at 81. Bearing in mind that the Second Circuit's decisions, particularly the *Gretsch* and *Appollonaris* cases, had declared that a manufacturer's goods did not infringe American trademark rights because they were "genuine," it becomes plain that Congress wanted it absolutely clear that sharing a common foreign manufacturing origin with the American trademark owner's goods did not make other similarly or identically trademarked goods purchased abroad any less infringing. Again without limiting language, Congress stated that "any merchandise of foreign manufacture" bearing a trademark owned by an American could be denied entry, on the unstated, but obvious ground that sale of the article by someone not the trademark owner would infringe the trademark owner's rights.

Besides adopting an interpretation of § 526 at odds with the plain import of its language, the *Guerlain* court gave short shrift to the defendants' contentions that they owned the goodwill symbolized by the trademarks, and that this deserved legal protection even against imports from the foreign parent companies. By lumping the American companies with their foreign parents in a single international enterprise and ignoring the formalities of corporate structure, the court was able to belittle the role of trademarks in a distribution system geared to international markets.

"The exclusive right to sell in the American market on the part of an international concern exploiting world markets is not an element of good will except insofar as it may be made so artificially by import prohibitions. *A competing importer selling identical merchandise under the same trademark would not be a 'pirate' or a 'cheat.' The public would not be deceived about the authenticity or origin of the product and the reputation of the trademark owner could not suffer from the marketing of inferior merchandise under his mark.*" 155 F.Supp. at 82 (emphasis added).

Moreover, in the court's view, the defendants could not claim "that the trademarks indicate an origin with them in the United States, inasmuch as the whole burden of their advertising is to emphasize French origin." 155 F.Supp. at 81.

The view the *Guerlain* court expressed is strikingly similar to the approach adopted

---

**6.** In *Coty Inc. v. Le Blume Import Co.,* 292 F. 264 (S.D.N.Y.), aff'd, 293 F. 344 (2d Cir. 1923), Judge Hand denied the motion of Coty Inc. to dismiss a suit by Le Blume Import seeking to compel Coty Inc. to withdraw its § 526 notice to the Collector of the Port of New York to deny entry to two parcels of Le Blume's allegedly infringing scents. He explained the denial on the ground that § 526 "was not meant to prevent a person aggrieved by a trademark owner's notice to the collector from testing the trademark in the courts." 292 F. at 269.

The statement of facts reveals that Coty Inc. was a Delaware corporation organized by the French perfumer Coty to conduct his American business, principally selling perfumes. Although a genuine goods question was not presented, it is of some significance that apparently no one seriously considered the possibility that Coty Inc.'s evident foreign ownership disqualified it from invoking the statute's protection for American trademark owners, and that the motion to dismiss could be denied on that basis. In terms of the statutory language, which speaks generally of "American" owners of trademarks, it is difficult to say that the American subsidiary of a foreign company is less an "American" company when the goods it seeks to exclude are those of its parent, brought in by a competitor from abroad, than when the excluded goods are those of an unrelated company. Yet that interpretation is essentially what the *Guerlain* court sought to impose on the statute.

by the Second Circuit before the *Katzel* and *Aldridge* cases, and subsequently reversed by the Supreme Court, that notwithstanding ownership of a mark by the American distributor, and the existence of a goodwill in the American market created by that distributor in connection therewith, the trademark still symbolized the goodwill of the manufacturing source. This is most apparent when the court supported its declaration that § 526 was itself a departure from trademark principles, a "special privilege" the court did not believe that Congress could have conferred on an "international enterprise," by appending in a footnote the following quotation:

> " 'The rationale underlying trademark protection does not support the exclusion of genuine products by *independent* American trade-mark owners any more than it supports exclusion by related importers.' Note, 64 Yale L.J. 557, 567 (1955)." 155 F.Supp. at 82–83 & n.17 (emphasis in original).

Implicit in this assertion is the assumption that the "source of origin" of a product inevitably must be its manufacturer. That view is wholly inconsistent with the numerous American trademark decisions recognizing the exclusive American distributor as the owner of trademark rights. *See Watson v. E. Leitz, Inc.,* 254 F.2d 777, 780 (D.C.Cir.1958); *Avedis Zildjian Co. v. Fred Gretsch Mfg. Co.,* 251 F.2d 530 (2d Cir. 1958); *Roger & Gallet v. Janmarie Inc.,* 245 F.2d 505, 509–10 (Cust. & Pat.App.1957); *Georg Jensen & Wendel, A/S v. Georg Jensen Handmade Silver, Inc.,* 111 F.2d 169 (Cust. & Pat.App.1940); *see also G. H. Munn Champagne v. Eastern Wine Corp.,* 142 F.2d 499 (2d Cir. 1944).

The apparent reason for the *Guerlain* court's construction of § 526 as limited to "independent" distributors was its view of the merits of the antitrust claims. The court determined that invocation of § 526 permitted American distributors to monopolize the distribution of their trademarked goods by excluding potential competition from other goods emanating from the foreign parent. The court was persuaded that such an arrangement on an international scale could only survive as an implied exception to the Sherman Act, and found no authority for implying such an exception.

There are obvious and substantial flaws in the court's reasoning under § 2 in defining the relevant market in an artificially narrow fashion to be the separate lines of trademarked toilet goods the companies distributed. These have been too lucidly analyzed by a respected antitrust authority to merit detailed examination here. *See* M. Handler, Trademarks—Assets or Liabilities, 48 T.M.R. 661 (1958). It is sufficient to note that the *Guerlain* court's primary reason for defining the market as it did was its conception that "the most important element in the appeal of a perfume is a highly exploited trademark." 155 F.Supp. at 84–85. This preoccupation with the power of a trademark in defining a market for § 2 purposes is inconsistent with the Supreme Court's pronouncement in *United States v. E. I. duPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), that the controlling principle is the "reasonable interchangeability of products" for the purposes for which they are produced—price, use and qualities considered." 351 U.S. at 404, 76 S.Ct. at 1012. In fact, the Court explicitly rejected the concept that a powerful trademark could make a single product a relevant market.

> "[O]ne can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product." 351 U.S. at 393, 76 S.Ct. at 1006.

The foregoing analysis of the *Guerlain* decision demonstrates that it does not provide persuasive reasoning for narrowing either the scope of *Bourjois v. Katzel* or of § 526 to instances where the American trademark owner is unrelated to the foreign producer. In fact, the litigants in the

*Guerlain* case recognized that the "public interest" in "the main problem" of the meaning of § 526 "would be better served by an attempt to get a legislative resolution to the same effect as the decision of this Court." 172 F.Supp. at 107. On remand, the government, thus, sought and was granted a dismissal of the action, choosing instead to make its arguments in Congress. The congressional response to the ·Department of Justice's contentions was soon forthcoming: Congressman Celler introduced the proposed legislation two months later. H.R. 7234, 86th Cong., 1st Sess. (1959), *reprinted in* 49 T.M.R. (1959).

By section 3 of this bill, § 526 of the Tariff Act of 1930 was to be repealed. Section 42 of the Lanham Act, 15 U.S.C. § 1124, was to be amended by striking it entirely and substituting therefor provisions that barred importation of counterfeit goods, and, more importantly, declared that the Lanham Act remedies against trademark infringement

> "shall not be available against an importer or seller of goods bearing a mark registered to an agent, authorized distributor, or subsidiary of, or to a person who is affiliated with or controlled by, a foreign manufacturer or merchant who uses the registered mark to identify and distinguishes his goods." H.R. 7234, *supra,* § 2, amending 15 U.S.C. § 1124(b)(1).

In addition, the proposed legislation defined "affiliated" to include, without limitation, "an exclusive or a nonexclusive distribution contract and any arrangement whereby the person has a continuing contractual relationship or understanding, express or implied, with the foreign manufacturer, with regard to the mark." *Id.,* adding 15 U.S.C. § 1124(b)(2).

Unfortunately for the *Guerlain* approach, the bill *never* became law.

Apparently in response to the dismissal of the *Guerlain* cases, *see* J. Atwood, *supra,* 59 T.M.R. at 310, and the rejection of its position in Congress, the Customs Service deleted explicit reference to "related companies" from the regulations. *See* T.D. 54932. Nevertheless, the regulations still ruled that merchandise manufactured abroad under a trademark also registered in the United States did not "copy or simulate" the United States mark if the same person owned both the foreign and United States marks. *See* 19 C.F.R. § 11.14(b) (1971). Also disclosure was required of the "name and address of each foreign person ... using the mark while acting as the principal or agent of the trademark owner." *Id.* Apparently the Customs Service considered that the existence of such a relationship permitted it "to treat the firms as if they were the same." J. Atwood, *supra,* 59 T.M.R. at 310. In short, "[c]ommon control" of the local and foreign users of the mark "determine[d] the extent of import protection." *Id.*

■ Current regulations for the most part have been in effect since October 3, 1972. These make explicit the position of the Customs Service that the ban on importation of goods bearing marks that are identical to one owned and recorded by a citizen of the United States does not apply when:

> "(1) Both the foreign and the U.S. trademark or tradename are owned by the same person or business entity;
>
> "(2) The foreign and domestic trademark or tradename owners are parent and subsidiary companies or are otherwise subject to common ownership or control (see §§ 133.2(d) and 133.12(d));
>
> "(3) The articles of foreign manufacture bear a recorded trademark or tradename applied under authorization of the U.S. owner." 19 C.F.R. § 133.21(c) (1981).

The application to record a trademark with Customs must identify "any parent or subsidiary company, or other foreign company under common ownership or control which *uses* the trademark abroad." 19 C.F.R. §§ 133.2(d), 133.12(d) (1981) (emphasis added). For this purpose, the regulations define "common ownership" as "individual or aggregate ownership of more than 50 percent of the business entity," and "common control" as "effective control in policy and operations." Such control is not "necessarily synonymous with common ownership." *Id.,* § 133.2(d)(1), (2).

This regulatory exception has no application in this case. Mamiya Co., the owner of the trademarks in question, owns only 7% of plaintiff's stock and there is no evidence that it exerts any control over plaintiff's policies and operations.[7] Moreover, the variance between the literal language of the statute and the current interpretations adopted by the Customs Service has prompted more than one commentator to question whether the regulations implementing the interpretation are *ultra vires.* *See* P. Kuhn, Remedies Available at Customs, *supra,* 70 T.M.R. at 394; W. Derenberg, Current Trademark Problems in Foreign Travel and the Import Trade, 39 T.M.R. 674, 705 n.80 (1959).

That leaves the case, then, to be decided upon the fundamental question of trademark law, whether or not the defendant's use of the MAMIYA marks on medium format photographic equipment is likely to cause confusion with the plaintiff's use of the mark.

It is clear that such a substantial likelihood of confusion exists in this case. The business of selling MAMIYA goods in the United States is the plaintiff's business. It is the legitimate owner of the MAMIYA marks. Its ownership of those marks, conversely, "indicates in law," *Bourjois v. Katzel, supra,* 260 U.S. at 692, 43 S.Ct. at 245 that the goods came from plaintiff. It is plaintiff that defines the warranty and provides the repair services for the cameras it sells. The cameras defendant sells lack that warranty. No proof supports defendant's contention that the public associates the MAMIYA marks with the Japanese manufacturer, even assuming that such proof could alter the legal consequence of the assignment of the marks to plaintiff. For it must be recognized that plaintiff is not a mere shell but the legitimate and actual owner of the business of selling MAMIYA medium format products in this country.

There remains the contention that there can be no likelihood of confusion because plaintiff is part of an international organization distributing MAMIYA products. The business of the plaintiff in this country is different from that of Osawa Japan elsewhere in the world and that of Mamiya Co. in Japan. It is plaintiff's warranty and assurances of quality that are signified by the MAMIYA marks in this country. Defendant's use of those marks carries with it none of these assurances.

Accordingly, this Court concludes that a substantial likelihood of confusion has been demonstrated and that an injunction against defendant's sale of trademarked MAMIYA cameras should issue. The parties are directed to settle the form of the preliminary injunction on or before October 15, 1982.

SO ORDERED.

---

7. Plaintiff has obtained recordation of its marks with Customs, apparently on the ground that Osawa Japan is not the owner of the marks outside the United States, or authorized to use them. *See* plaintiff's May 5, 1982 letter to the Court.