**EL GRECO LEATHER PRODUCTS CO., INC. d/b/a Candie's International, Plaintiff,**

v.

**SHOE WORLD INC. d/b/a Gussini, Defendant.**

**No. 83 Civ. 5376.**

United States District Court, E.D. New York.

Dec. 21, 1984.

Mark M. Aarons, Richard Olicker, Harry I. Rand, James A. Altman, Botein, Hays, Sklar & Herzberg, New York City, for plaintiff.

Marc Dahan, Glenn Backer, Dahan & Nowick; Edward V. Filardi, M. Andrea Ryan, Brumbaugh, Graves, Donohue & Raymond, New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GLASSER, District Judge:

Plaintiff El Greco Leather Products Co., Inc., d/b/a Candie's International ("El Greco") brings this action against defendant Shoe World, Inc., d/b/a Gussini ("Shoe World"), alleging trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) and 1126(g), unfair competition, violation of New York Gen.Bus.L. §§ 368–b, 368–d and § 279–n, and violation of the Genuine Goods Exclusion Act, 19 U.S.C. § 1526.[1] Jurisdiction arises under 28 U.S.C. § 1331, 28 U.S.C. § 1338(a) and (b), and 15 U.S.C. §§ 1121 and 1125(a).

El Greco seeks a permanent injunction restraining defendants from using the mark "CANDIE'S" on any goods sold by defendant. El Greco also seeks compensatory damages in an amount yet to be determined, punitive damages in the amount of $10,500,000, destruction of the allegedly infringing goods and an order requiring defendant to place advertisements disclaiming any connection between the shoes sold by it and plaintiff.

In response, defendant has alleged counterclaims for defamation, trade defamation and disparagement, tortious interference, unfair competition, prima facie tort and abuse of civil process. Defendant seeks to enjoin plaintiff from engaging in the above activities and demands compensatory damages of at least $42,000,000 and punitive damages in an amount to be determined.

Simultaneous with its commencement of this action, plaintiff made an application, by ex parte order to show cause, for a temporary restraining order and preliminary injunction on December 13, 1983. I originally denied plaintiff's application for a temporary restraining order due to plaintiff's failure to comply with the notice requirements of Fed.R.Civ.P. 65(b). On December 16, 1983, I reconsidered plaintiff's request for relief at a hearing where both parties were present. At that time, I

granted the application for a restraining order on the basis of papers which alleged that defendant was selling counterfeit CANDIE'S shoes. *See infra* at 1388–1389. After a hearing on December 30, 1983, Judge Platt vacated the temporary restraining order conditioned on defendant's voluntary agreement not to sell the allegedly infringing shoes pending adjudication of the order to show cause for a preliminary injunction. At the conclusion of a hearing held on January 10, 1984 and January 19, 1984, I denied plaintiff's application for a preliminary injunction due to its failure to establish the existence of irreparable harm. Tr. 448–50.[2] Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, the hearing of January 10 and 19 was treated as a trial on the merits.

On the basis of the hearing held on January 10 and 19, 1984, as well as on supplemental memoranda and proposed findings submitted thereafter by both parties, the following represent my findings of fact and conclusions of law. For the reasons that follow, I find that plaintiff is not entitled to the relief it seeks.

## I. FINDINGS OF FACT

### A. *The Parties and Their Industry*

Plaintiff El Greco is a New York corporation which merchandises various types of shoes and wearing apparel in the United States. With regard to its marketing of shoes, plaintiff routinely engages foreign manufacturers to manufacture shoes under plaintiff's trademark. Plaintiff thereafter imports these shoes into the United States and sells them here.

At all times relevant to this action, plaintiff has been the owner of the duly registered federal and New York State trademarks "CANDIE'S." Plaintiff's federal trademark, Registration No. 1,157,373 applies to boots, shoes and slippers and has been registered with the United States Customs Service pursuant to 15 U.S.C. § 1124

---

**1.** Plaintiff added the eighth cause of action, alleging violation of 19 U.S.C. § 1526, by amendment filed with this Court on January 16, 1984.

**2.** "Tr." refers to the transcript of the hearing held on January 10, 1984 and January 19, 1984.

and 19 U.S.C. § 1526. Plaintiff's mark is registered in New York State in connection with the sale of shoes and jeans.

Defendant Shoe World, a Maryland corporation, has 92 "Gussini" stores nationwide. Through these stores, defendant distributes women's shoes in the central and eastern United States at a set retail price, which for the year 1983 was $13.88. Approximately 80% of Shoe World's total sales volume is derived from shoes manufactured to its own specifications and sold under its own trademark. The remainder of Shoe World's sales volume is generated by the sale of other brands constantly offered throughout the trade. The sale of job-lot and closeout merchandise represents approximately 20% of Shoe World's overall business. Plaintiff's employees, particularly Chris Crabill and Lynn Miller, as well as plaintiff's president, Charles Cole, knew at least as of June 1982 that Shoe World sells all of its women's shoes, including CANDIE'S shoes, at its set retail price of $13.88, and were familiar with Shoe World's marketing practice.

At issue in this action is defendant's importation and sale of certain Brazilian-made CANDIE'S women's shoes, namely, Style No. 4666 Dramatic, No. 4216 Loyalty, and No. 1431 Bravo. Plaintiff essentially merchandises such apparel in the following manner.

Plaintiff engages Brazilian manufacturers, among other foreign firms, to manufacture its women's shoes. Sapatus Assessoria e Lancamentos Ltds., ("Sapatus"), a Brazilian firm, is plaintiff's exclusive representative for the production of shoes in Brazil. Acting on plaintiff's behalf and with plaintiff's approval, Sapatus selects the manufacturers with which orders will be placed; the production of any particular shoe style, if the volume is substantial, may be entrusted to more than one manufacturer.

Sapatus then places the orders with the manufacturers, supervises production at the factories; exercises careful control of the quality of the merchandise and assures that it accords in every respect with plaintiff's standards and specifications, inspects the shoes as they are produced and after lots are completed and tendered for delivery to plaintiff, certifies that the lots are in compliance with plaintiff's standards and specifications, and then arranges for shipment of the completed lots to plaintiff. In the event that there have been quality problems at a given factory, Sapatus will permanently station its employees at that factory to inspect and review the shoes as they are manufactured, virtually on a pair-by-pair basis. Shoes that are found to have any noticeable defects, that are inferior in quality or otherwise not in compliance with plaintiff's standards and specifications are rejected, and the manufacturer is required to set them aside and not to include them in lots tendered to plaintiff. No shoes are approved or accepted unless and until a principal of Sapatus signs an Inspection Certificate certifying that the lot of shoes to which it relates fully complies with plaintiff's standards and specifications. As will be detailed further below, however, plaintiff has failed to demonstrate that any of the allegedly infringing shoes sold by defendant were defective.

Plaintiff's specifications for shoes manufactured in Brazil provide, among other things, that the CANDIE'S trademark shall be imprinted or stamped on the sock lining inserted into the shoe. The insertion of the sock lining is one of the final steps in the manufacturing process. Tr. 25. As to some shoes, the specifications have provided also for the insertion of a metallic tag bearing the mark at the base of the heel. It is unclear whether the metallic tag can be removed from shoes without destroying or effectively impairing them. Tr. 77–78, 156–57, 159–60.

In addition, there is no market in Brazil for women's shoes which had been produced for eventual sale in the United States; rather, the only realistic market for such shoes is the United States. Thus, any shoes made by a Brazilian manufacturer for plaintiff but not accepted by plaintiff could not be disposed of for retail sale in Brazil; realistically, they could be sold only in the United States. At the close of its seasonal sales, the plaintiff regularly sells

CANDIE'S shoes as closeout merchandise to discount shoe chains such as Shoe World, Barett and Delton, which sell the shoes at prices substantially lower than full price. Like defendants, Barett and Delton also sell CANDIE'S shoes at the set retail price of $13.88. Tr. 170–72, 196–97; D. Exhs. K & J. Prior to the controversy which resulted in this lawsuit, defendant purchased CANDIE'S shoes from plaintiff in 1981, 1982 and 1983 in this manner.

Defendant Shoe World also acts through agents in order to conduct its retail shoe business. Defendant's agent for the purpose of purchasing shoes made in Brazil is Fulvio Alviani of Alviani Imports (both hereafter referred to as "Alviani"), who buys for his own company in addition to acting as defendant's agent. In all transactions relevant to this action, Alviani purchased shoes from a Brazilian agent, Intra Exportacoes Ltda. ("Intra").

## B. The Instant Controversy

### 1. Style No. 4666 Dramatic

The Style No. 4666 shoes represent the greatest quantity of shoes in controversy.

On March 17, 1983, plaintiff placed an order with Solemio, Ltda. ("Solemio"), a Brazilian manufacturer, for the production of 25,200 pairs of Style No. 4666, at a cost to plaintiff of $7.10 a pair ex factory. The shoes were to be manufactured for and shipped to plaintiff no later than 15 days after May 30, 1983, ex-factory, in seven separate lots, 2505A–2505G, of 3,600 pairs each. To effect payment, plaintiff opened a bank letter of credit in Solemio's favor for $178,920. This letter of credit, among other things, required, as conditions of payment, that Solemio submit (a) an Inspection Certificate, signed by an authorized representative of Sapatus, certifying that the lot to which it related had been approved for shipment in accordance with plaintiff's specifications and (b) a certification by Solemio that it would not sell Style No. 4666 to any other companies in the United States.

Pursuant to its purchase orders for lots 2505 A–G, plaintiff authorized Solemio to make the shoes in issue to plaintiff's specifications for its shoe style 4666, including affixing the CANDIE'S trademark to the goods. Sapatus inspected and released the first five lots of CANDIE'S shoe style 4666, orders 2505 A–E, for delivery to plaintiff. Sapatus executed its Inspection Certificates with respect to those five lots; Solemio submitted its certification that it would not sell Style No. 4666 to any other companies in the United States; and the shoes were shipped to plaintiff and paid for. As part of plaintiff's fall 1983 line, the shoes were sold by plaintiff to its retail customers at $15.75 per pair until the end of October, when, with the close of the fall season, it began to offer them to the trade on a closeout basis.

In the course of their inspections at the Solemio factory, however, Sapatus' representatives allegedly detected defects in the quality of many of the shoes; and, in May 1983, Alan Franklin, plaintiff's production development director, on a visit to the factory, also observed quality defects in numerous shoes. In his "Report on Quality and Factory Visits—Brazil May 16–20" to Sapatus, Franklin stated the following regarding Solemio's production of Style No. 4666:

> General quality of Dramatic pumps was poor. After we stopped conveyor and installed additional moulding m/c backs improved. Backseam nailing must be hammered after tack is removed. Binding of vamp seam and topliner must be lighter and tighter. Trimmings of linings must be cleaner and neater. Final upper dressing must be even and applied with more care.

Plaintiff's Exh. 8; Tr. 99. Although plaintiff urges that due to these defects, Sapatus and Franklin continually rejected large quantities of the shoes and instructed Solemio that plaintiff would not accept the shoes and that the shoes should be set aside and not disposed of without removing the CANDIE'S mark,[3] the Franklin report

---

**3.** Plaintiff's Proposed Finding of Fact No. 23.

makes no mention of Sapatus or Franklin doing or directing Solemio to take any of the actions mentioned above.

At some time prior to July 12, 1983, Sapatus, at plaintiff's request, cancelled lots 2505 F and 2505 G, including approximately 7,200 pairs of Style No. 4666. Although plaintiff has vigorously contended that these shoes were rejected due to quality problems, *see e.g.,* Tr. 50–51, 55, 62–63, 67–68, 95–96, I do not find this assertion to be credible. Sapatus' own confirmatory telex expressly stated the reason for cancellation to be "late delivery." Larry Noss, a partner in Sapatus, testified that lots F and G were rejected due to quality defects. However, plaintiff was unable to produce any evidence to corroborate this allegation. In addition, plaintiff's position is further undercut by Noss' own testimony that it was Sapatus' "normal procedure" to inform a factory, in writing, of the reasons why its goods were not accepted. Tr. 61–63. *See also* Tr. 68, 96–97 (although Noss testified that there might be some documentation in Brazil stating that the shoes were rejected due to quality defects, none was produced). Plaintiff's argument is also undermined by Noss' own testimony, after examining one 4666 shoe manufactured by Solemio and one produced by the Wirth factory in Brazil, that it was the Wirth shoe which appeared to have an off-color binding. Tr. 75–79. Noss was thus unable to distinguish any difference between plaintiff's Style No. 4666 and the same style sold by defendant.

In addition, plaintiff's assertion that the cancelled Style No. 4666 shoes are not "genuine" because they were never completed must fail. This argument is not credible in the face of testimony by both Alan Franklin and John Wintersteen that the allegedly defective lots F and G *were* manufactured to completion even though plaintiff had rejected them. Tr. 152, 173–74.

Plaintiff's purchase order No. 2505, on which the cancellations of Lots F and G are noted in handwriting, does not indicate any instruction to Solemio as to the disposition of the cancelled lots. Plaintiff's Exh. 1. The only document that could be construed to impose any restriction thereon is plaintiff's original letter of credit, which states: "Beneficiary must certify that style # 4666 described in this letter of credit will not be sold to any other companies in the United States." It is unclear from this language whether sale of the style or the shoe is intended to be restricted, and the purchase order does not specifically address the disposition of cancelled goods.

On June 27, 1983, defendant, through Alviani, purchased from Intra 2,844 pairs of Style No. 4666 shoes manufactured by Solemio which bore the CANDIE'S trademark and were packed in boxes marked CANDIE'S. The shoes were to be delivered to defendant's Maryland warehouse by July 1, 1983. Also on June 27, defendant placed an additional order through Alviani from Intra for 3,258 pairs of Style No. 4666, to be delivered in the same fashion by September 28, 1983. Pursuant to these orders, 7,056 pairs of Style No. 4666 women's shoes bearing the CANDIE'S trademark were shipped to defendant and imported by it into the United States. The price paid by defendant for these shoes was $4.00 per pair, F.O.B. Brazil. Beginning in August 1983 and continuing into October 1983, these shoes were offered for sale and sold by defendant at its retail stores in the United States at a price of $13.88 per pair. Although plaintiff urges that "it is as probable as not that the [4666] shoes purchased by defendant from Solemio were shoes it manufactured in addition to those manufactured pursuant to plaintiff's purchase order [and later cancelled],[4] I do not find this allegation to be credible. Plaintiff has offered no evidence to support this contention. It is more apparent from the evidence that the goods bought by defendant *are* the shoes from lots F and G cancelled by plaintiff. The number of pairs of shoes purchased by defendant correspond almost exactly with the number of pairs of Style No. 4666 cancelled, and as noted above, plaintiff has not submitted

---

4. Plaintiff's Proposed Finding of Fact No. 33.

any evidence which could even imply that Solemio manufactured additional Style No. 4666 shoes beyond the original lots A–G ordered by plaintiff.

Finally, it is important to note that on or about October 27, 1983, the same day that Charles Cole, plaintiff's president, first telephoned Paul Gussin, president of Shoe World, to complain about Shoe World's sale of CANDIE'S shoe style 4666, *see infra* at 16–18, plaintiff, through its salesman, Chris Crabill, offered the same CANDIE'S shoe style 4666 to Shoe World as close-out merchandise. Tr. 278, 328, 331–32, 363–68; Defendant's Exh. BB. The offer by Chris Crabill to sell shoe style 4666 to Shoe World was made with the knowledge of Charles Cole. Tr. 327, 367. *Cf.* Tr. 328.

### 2. *Style No. 4216 Loyalty*

On March 2, 1983, plaintiff placed purchase order No. 2442 through Sapatus with Cal & Cidos Relim S.A. Ind. E. Com. ("Relim"), another Brazilian manufacturer, for 360 pairs of a style of women's shoes designated Style No. 4216 Loyalty, at a cost to plaintiff of $7.35 a pair ex-factory. The shoes were to be manufactured for and shipped to plaintiff no later than 15 days after April 15, 1983, the ex-factory date. On April 1, 1983, plaintiff replaced that order with a larger order for the same style of shoes. In placing this order, plaintiff authorized Relim to label the Style No. 4216 shoes with the CANDIE'S trademark. On April 4, 1983, plaintiff cancelled its order for these shoes and placed a larger order with Relim at a lower ex-factory price. At the preliminary injunction hearing, plaintiff's Vice President of Operations, John Wintersteen, testified that he did not know why plaintiff had not accepted the 360 pairs of shoes originally ordered. Tr. 170. Plaintiff offered no proof that the original order of 360 pairs of Style No. 4216 was cancelled because of quality control problems.

On August 11, 1983, defendant, through Alviani, purchased through Intra 360 pairs of Style No. 4216 manufactured by Relim. The shoes bore the CANDIE'S trademark and were packaged in boxes so marked and were to be purchased at a price of $4.60 per pair F.O.B. Brazil, for delivery ex-factory by August 20, 1983, and to defendant's warehouse in Elkridge, Maryland by September 20, 1983. Pursuant to that order, 360 pairs of the Style No. 4216 shoes bearing the CANDIE'S trademark were shipped to defendant and were imported by it into the United States. Beginning in or about September 1983, these shoes were offered for sale and sold by defendant at its retail stores in the United States at a price of $13.88 per pair. Although plaintiff again suggests that the shoes purchased by defendant may have been manufactured by Relim in addition to the shoes ordered by plaintiff, there is no credible evidence to support this contention. Again owing to the correspondence between the number of pairs of Style No. 4216 cancelled by plaintiff and bought by defendant, I find no reason to doubt that defendant purchased the shoes manufactured by Relim that had been cancelled by plaintiff.

### 3. *Style No. 1431 Bravo*

In 1982, plaintiff placed an order with Brochier S/A, another Brazilian manufacturer, for the manufacture of a quantity of women's shoes designated Style No. 1431 Bravo, to be shipped to plaintiff in early May 1982. Plaintiff's allegation that it cancelled a portion of this order due to quality control problems at Brochier which prevented the shoes from being ready for delivery until October 1982 is not supported by the evidence. Rather, plaintiff cancelled a portion of the Style No. 1431 order because of late delivery and did accept the remaining 3,600 pairs. The shoes actually purchased were sized improperly and ran a size to a size and a half short. Plaintiff returned the shoes to Brochier, which amended the letter of credit to reflect an adjustment on the price of the shoes. Tr. 171. Plaintiff sold the mis-sized Style No. 1431 shoes to various discount outlets other than Shoe World, as closeout merchandise. *See* Tr. 196–200.

The Brochier invoice referring to the letter of credit by which plaintiff originally ordered the Style No. 1431 shoes certifies

that that style "will not be sold to any other companies in the U.S.A." Plaintiff's Exh. 18. However, plaintiff has not submitted any documentation regarding plaintiff's cancellation of any portion of the Brochier shoes, nor any written instructions from plaintiff to Brochier regarding the disposition of cancelled merchandise.

On December 8, 1982, defendant, through Alviani, purchased from Intra 3,110 pairs of Style No. 1431 women's shoes manufactured by Brochier and bearing the CANDIE'S trademark, at a price of $3.50 per pair F.O.B. Brazil, for delivery ex-factory by January 15, 1983, and to defendant's warehouse in Elkridge, Maryland by February 15, 1983. Pursuant to that order, 3,110 pairs of the Style No. 1431 women's shoes bearing the CANDIE'S trademark were shipped to defendant and imported by it into the United States. They were offered for sale and sold by defendant at its retail stores in the United States at a price of $13.88 per pair. Again, although plaintiff suggests that the Style No. 1431 shoes cancelled by plaintiff and brought by defendant are not the same shoes, plaintiff has offered no proof that Brochier manufactured an additional 1,431 shoes beyond the original order by plaintiff or that defendant otherwise obtained any such shoes from Brochier.

### 4. Shoe Orders from the Martini and Noel Factories

On April 27, 1983, defendant, through Alviani and Intra, purchased from a Brazilian manufacturer identified as "Martini," 2,551 pairs of women's shoes bearing the CANDIE'S trademark and packaged in boxes also so marked, at a price of $5.00 per pair F.O.B. Brazil, for delivery to defendant's warehouse in Elkridge, Maryland by June 1, 1983. Defendant's Exh. U. Pursuant to this order, these women's shoes, bearing the CANDIE'S trademark, were shipped to defendant and imported by it into the United States; and were offered for sale and sold by defendant at its retail stores in the United States at a price of $13.88 per pair. Similarly, on August 11, 1983, defendant, through Alviani and Intra, placed an order for the purchase from a Brazilian manufacturer identified as "Noel" of 1,800 pairs of shoes bearing the CANDIE'S trademark and packaged in boxes also so marked, at a price of $3.50 per pair F.O.B. Brazil, for delivery ex-factory by August 20, 1983, and to defendant's warehouse in Elkridge, Maryland by September 20, 1983. Defendant's Exh. V. Pursuant to this order, these women's shoes, bearing the CANDIE'S trademark, were shipped to defendant and imported by it into the United States; and were offered for sale and sold by defendant at its retail stores in the United States at a price of $13.88 per pair.

The record does not disclose any details of the relationship between plaintiff and Martini or Noel, nor does it reveal any details regarding the manufacture of the shoes in controversy. Thus, plaintiff has not proven that the shoes purchased by defendant were not originally manufactured by Martini and Noel at plaintiff's direction. Tr. 80–81, 297–300, 317–20.

### 5. Commencement of this Action

As stated above, defendant Shoe World offered for sale Style Nos. 4666, 4126 and 1431 during 1983. In October 1983, after allegedly receiving complaints from certain retail customers that defendant was selling current CANDIE'S shoes at prices significantly less than those at which the retailers were or could be selling the same, plaintiff's executive committee met during October 1983 to discuss these complaints. On October 27, 1983, plaintiff's president, Charles Cole, telephoned defendant's president, Paul Gussin, to object to defendant's sale of CANDIE'S Style No. 4666 only. On October 28, Gussin issued a recall on Style No. 4666 shoes to all Shoe World Regional Managers, District Managers and Store Managers. Defendant's Exh. L. Gussin and Cole engaged in two more telephone discussions during early November 1983, and during one or both of these conversations, Gussin informed Cole that the shoes came from Intra in Brazil. Tr. 136, 236.

On November 3, 1983, Gussin received a letter dated October 28, 1983 from Richard

Olicker, plaintiff's general counsel. Defendant's Exh. M. In that letter, Olicker asserted that in light of recent events and Gussin's alleged "admission" made in a recent telephone conversation with Charles Cole, defendant was engaging in knowing, willful and fraudulent infringement of the CANDIE'S trademark. In addition to stating the potential legal ramifications of the perceived problem, the Olicker letter demanded that plaintiff identify the supplier of the goods involved, as well as the quantity, price paid by defendant, defendant's distribution schedule and sales to date. When plaintiff did not receive a response to the Olicker letter, plaintiff filed this action, along with an order to show cause for a temporary restraining order and preliminary injunction, on December 13, 1983. The complaint alleges that defendant sold shoes which "duplicate shoe styles of Plaintiff" and are "counterfeit." Complaint ¶ 11. That paragraph further states:

> Although identical in appearance, the counterfeit · shoes were manufactured, packaged, imported and distributed without authorization from Plaintiff. The counterfeit shoes are not in any way associated with Plaintiff and Shoe World d/b/a Gussini acquired these shoes through no association or contact with Plaintiff, Plaintiff's agents, or Plaintiff's employees in either the United States or foreign jurisdictions.

In addition, the affidavit of Charles Cole submitted in support of plaintiff's application for injunctive relief stated:

> 9. The shoes being sold by Shoe World are recognizable by me as counterfeit goods for the following reasons:
>
> (a) Various shoes are of decidedly and readily apparent inferior quality as compared to the CANDIE'S shoes marketed by plaintiff under the trademark CANDIE'S.

> (b) The sole of at least one style of the counterfeit shoes is different from that of any shoe ever sold by plaintiff and is of a decidedly inferior quality.
>
> (c) The counterfeit shoes were sold to consumers at the *retail price* of $13.88. Similar CANDIE'S shoes sold by plaintiff to retailers would be sold at the *wholesale price* of $14.25. The usual retail price would be approximately $28.00.

Affidavit of Charles J. Cole, dated December 8, 1983 (emphasis in original).[5]

The complaint and request for immediate injunctive relief alleged that such relief was necessary due to potential harm to plaintiff's reputation and upcoming business ventures anticipated in the December 1983 Volume Retailer Shoe Show and National Shoe Show in New York City. *Id.* ¶ 14. The complaint and order to show caused made no mention of prior business dealings between the parties, the possibility that Intra was the source of the allegedly infringing shoes, or of defendant's October 28 recall of the Style No. 4666 shoes.

On December 20, 1983, a temporary restraining order was entered by this Court enjoining defendant from selling shoes bearing plaintiff's trademark CANDIE'S. On December 30, 1983, the temporary restraining order was vacated by Judge Platt on a showing that the allegedly infringing shoes had been originally made at plaintiff's request by one of its Brazilian manufacturers and were not "counterfeit" within the usual meaning attached to that word.

On January 19, 1984, at the conclusion of the preliminary injunction hearing, plaintiff was denied relief based on its failure to demonstrate irreparable harm. Specifically, the record demonstrated that on October 28, 1983, the very same day on which plaintiff's president telephoned defendant's

---

**5.** Virtually simultaneously with the filing of this action, plaintiff's in-house counsel informed Footwear News, a trade publication, of its claims that Shoe World was selling counterfeit CANDIE'S shoes. An article entitled, "El Greco asks $21 mil. in Shoe World lawsuit" appeared in the December 19, 1983 issue of that publication. Defendant's Exh. · O. Quoting the complaint and statements by Mark Aarons, plain-tiff's counsel, and Neil Cole, plaintiff's executive vice president, the article repeatedly stated plaintiff's allegations and belief that defendant was selling counterfeit CANDIE'S shoes. The article also indicated plaintiff's belief that "the shoes were imported directly from Brazil," and plaintiff's request that Shoe World "place advertisements to the effect that the counterfeit shoes 'were not in any way connected with plaintiff.'"

president regarding defendant's sale of Style No. 4666 shoes, plaintiff's salesman had offered the same style shoe to defendant's representative. In addition, plaintiff's shoes had clearly been sold by other outlet shoe stores at the price of $13.88. *Cf.* Cole Affidavit, *supra* at 17, ¶ 9(c).

## II. CONCLUSIONS OF LAW

 It is settled law in this Circuit that in order to obtain a preliminary injunction, a party must make

a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). In determining whether a permanent injunction should issue, however, a court "must first determine if plaintiff has succeeded on the merits. If so, the Court must then decide whether the 'balance of equities' favor [sic] injunctive relief, and if so, what form it should take." *Sierra Club v. Alexander*, 484 F.Supp. 455, 471 (N.D.N.Y.), *aff'd mem.*, 633 F.2d 206 (2d Cir.1980). The equitable principles to be considered with regard to granting either permanent or preliminary injunctive relief are the same, *Sierra Club v. Hennessy*, 695 F.2d 643, 647 (2d Cir.1982), and "the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (citations omitted). In the instant case, I find that plaintiff is not entitled to a permanent injunction because it has neither succeeded on the merits nor established a case meriting such equitable relief.

### A. *Federal Trademark Infringement*

Plaintiff has alleged that defendant has infringed plaintiff's CANDIE'S trademark by its sale of the women's shoes discussed above. Plaintiff adheres to the position that these CANDIE'S shoes are "counterfeit" because even if the Brazilian factories could be found to have legitimately applied the mark to the shoes, plaintiff's cancellation of the various shoe orders impliedly revoked the manufacturer's authority to dispose of any of the shoes without removing the CANDIE'S mark. Plaintiff urges that its mark is infringed because it did not authorize the sale of its cancelled goods.[6] Tr. 419–22. I find from the record, however, that the goods in controversy are "genuine" CANDIE'S shoes which may have been improperly disposed of by plaintiff's Brazilian manufacturers. Thus, my inquiry will examine whether plaintiff may maintain any claims for trademark infringement for the allegedly unauthorized sale of genuine goods.

Plaintiff bases its federal trademark infringement claims on § 32 of the Lanham Act, 15 U.S.C. § 1114 (infringement of service marks and trademarks), § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (false designation of origin of goods) and § 44(g) of the Lanham Act, 15 U.S.C. § 1126(g) (infringement of trade name).

 Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), prohibits the use of a trademark (1) without consent, (2) in connection with the sale of goods, (3) in a manner that is likely to cause confusion or to deceive the purchaser as to the source or origin of the goods. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the use in connection with any goods or services of a false designation of origin or any false description or representation. The "heart of a successful claim" under either statute is a showing of likelihood of confusion, that is, whether an appreciable number of purchasers is likely to be misled as to the source or sponsorship of defendant's products. *Standard and Poor's Corp. v. Commodity Exchange*, 683 F.2d

---

6. As indicated *supra*, plaintiff has not proven its allegation that the Brazilian manufacturers manufactured more CANDIE'S shoes than El Greco had originally ordered. The only credible inference that can be drawn from the record is that Shoe World purchased the same goods which plaintiff had originally ordered and later cancelled.

704, 708 (2d Cir.1982); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664 (2d Cir.1968); *Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F.Supp. 785 (E.D.N.Y.1983); *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947 (S.D.N.Y.1980).

■ Section 44(g) of the Lanham Act, 15 U.S.C. § 1126(g), appears inapplicable to this action, as its purpose is to extend protection to the trade or commercial names of any foreign national whose country of origin is party to any convention or treaty relating to trademarks, trade or commercial names or the repression of unfair competition and who meets the other requirements set forth in 15 U.S.C. § 1126(b).

Plaintiff El Greco is the owner of the trademark CANDIE'S and has the exclusive right to use that mark in United States commerce on shoes, boots and wearing apparel. The trademark CANDIE'S when used on women's shoes signifies in law and in fact that shoes so marked come from plaintiff and that plaintiff sponsors such shoes, stands behind them and stakes its reputation on their character. *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 692, 43 S.Ct. 244, 245, 67 L.Ed. 464 (1923). *See also, e.g., Roger & Gallet v. Janmarie, Inc.*, 245 F.2d 505, 510–11 (C.C.P.A.1957); *E. Leitz, Inc. v. Watson*, 152 F.Supp. 631, 635 (D.D. C.1957), *aff'd*, 254 F.2d 777 (D.C.Cir.1958).

■ The fact that plaintiff is not the manufacturer of the shoes does not deprive it of the right to be protected in the use of the trademark CANDIE'S. It uses the mark to designate shoes manufactured for it and which it approves and accepts in the exercise of its best judgment, as equal to a certain standard. The mark does not indicate by whom the shoes are manufactured; instead it denotes the origin of their selection and classification. It is equivalent to a certification by plaintiff that the shoes so marked are genuine in that they have been determined by plaintiff to possess a certain degree of excellence. It may not in itself

indicate quality, but it evidences that plaintiff's skill, knowledge and judgment has been exercised in ascertaining that the particular shoe so marked is possessed of a merit "rendered definite by [its] examination and of a uniformity rendered certain by [its] selection." *Menendez v. Holt*, 128 U.S. 514, 520, 9 S.Ct. 143, 144, 32 L.Ed. 526 (1888).

■ Defendant does not dispute the significance of the CANDIE'S trademark or plaintiff's right to be protected in the use of that mark. Defendant, however, contends that its acts do not constitute trademark infringement.

Plaintiff urges that any shoes sold by a Brazilian manufacturer without the consent of plaintiff are not genuine CANDIE'S shoes and the sale of such shoes deceives the public into believing that plaintiff sponsored or approved the shoes in question and deprives plaintiff of control over its own reputation. Furthermore, plaintiff claims that the sale of goods by a manufacturer without the consent of the trademark owner constitutes trademark infringement and false designation of origin even where the trademark owner has previously authorized the manufacturer to sell similar goods bearing that trademark. Plaintiff relies on numerous authorities to support this position, including *Burger King Corp. v. Mason*, 710 F.2d 1480, 1941–93 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984); *Professional Golfers Ass'n v. Bankers Life & Cas. Co.*, 514 F.2d 665 (5th Cir.1975) ("*PGA*"); *American Express Company v. Your Travel Agency, Inc.*, 214 U.S.P.Q. 341 (E.D.N.Y.1981) ("Amex"); *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947 (S.D.N.Y.1980) and *Burberrys (Wholesale) Limited v. After Six, Inc.*, 122 Misc.2d 561, 471 N.Y.S.2d 235 (Sup.Ct.N.Y.Co.1984). Plaintiff's reliance on these cases is, however, misplaced.

In *Burger King, PGA*, and *Amex*, for example, the courts were faced with situations in which a plaintiff trademark holder terminated a license to use that mark

which had been granted to the defendant. The *Burger King* court stated:

> It is well established that 'falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source *or sponsorship* constitutes infringement.' ... Thus, a trademark infringement case need not just involve imitation of the registrant's mark. The unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement.

710 F.2d at 1492 (*citing PGA, supra,* 514 F.2d at 670) (emphasis in original). In *Bowmar,* the defendants violated a license agreement and admittedly used plaintiff's trademark without consent when they sold products other than those licensed by plaintiff with the Bowmar name imprinted thereon. As defendant correctly urges, these cases are inapposite, as this case does not involve termination of or violation of a license agreement. Rather, the CANDIE'S mark was affixed to the shoes in question by plaintiff's foreign manufacturers and under the apparent supervision of plaintiff's agent Sapatus.

Although the facts in *Burberrys, supra,* are more similar to those of this case, they also provide no support for plaintiff's arguments. *Burberrys* was a state trademark infringement case in which plaintiff sought an injunction *pendente lite* to prevent defendants from manufacturing and selling approximately 8,000 raincoats. Plaintiff and defendant Abraham Zion Corp. had a licensing agreement pursuant to which Zion was to manufacture 30,000 trademarked "Burberry" raincoats. Plaintiff supplied to Zion "its distinctive material, all patterns, styles, dates, labels, tags and documents necessary for the making of the raincoats." 471 N.Y.S.2d at 236. After 22,000 coats had been manufactured and shipped to plaintiff's retailers pursuant to the contract, a dispute arose between the parties and no further "cutting orders" were given to defendant. Plaintiff advised defendant not to manufacture or sell the remaining coats and also cancelled the license. In support of its application for injunctive relief, plaintiff urged that Zion intended to manufacture and sell the remaining coats and may have already attempted to do so. In issuing the injunction, the court found that defendant's continued use of plaintiff's trademark after expiration of its license for such use constituted infringement, and cited, among others, the *Burger King* and *PGA* cases discussed *supra.*

Like the instant case, *Burberrys* involved the potential improper disposition of trademarked goods by a manufacturer. However, unlike this case, the manufacturer in *Burberrys* clearly lacked the authority to apply plaintiff's mark to its goods or even to manufacture the remaining 8,000 coats. In contrast, the rejected lots of Style No. 4666 CANDIE'S shoes here were completed and labelled with the CANDIE'S mark with plaintiff's permission. When the goods were cancelled, Solemio was not specifically instructed as to how it should dispose of the completed cancelled goods. As to the other allegedly infringing shoes, plaintiff has not offered any evidence to support its position that its mark was applied without consent. In addition, the defendant in *Burberrys* was the manufacturer of the goods; here, the manufacturers are not even parties to this action. Although it is true that even a retailer, such as Shoe World, who had no part in the manufacture of the goods or in the application of the mark to the goods can be an infringer, *see, e.g., Bowmar Instrument Corp. v. Continental Microsystems, Inc., supra,* 497 F.Supp. at 957, the goods here cannot be deemed infringing for the reasons further set out below.

The issue remains as to whether genuine goods can be infringing. I find defendant's contention that this cannot be so to be persuasive. Helpful to an analysis of this issue are *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corp.,* 707 F.2d 1054 (9th Cir.1983); *DEP Corp. v. Interstate Cigar Co.,* 622 F.2d 621 (2d Cir. 1980); and *Diamond Supply Co. v. Prudential Paper Products Co.,* 589 F.Supp. 470 (S.D.N.Y.1984).

In *DEP*, Unilever Export Ltd., a British corporation, was the holder of worldwide distribution rights for Pears Soap, whose trademark was owned by another British corporation, A. & F. Pears Ltd. Plaintiff DEP obtained from Unilever exclusive rights to distribute Pears in the United States and Puerto Rico. After entering into this agreement, DEP learned that defendant Interstate was selling Pears within the United States.

DEP then filed suit and sought a preliminary injunction preventing Interstate from allegedly infringing the Pears trademark. The district court dismissed the complaint based on its finding that DEP lacked standing to sue Interstate for trademark infringement because DEP was not the owner of the trademark. The appellate court affirmed dismissal of the infringement claim due to lack of standing, but remanded for consideration of whether DEP might have had a cause of action for intentional interference with contractual relations. In a footnote the Second Circuit expressed in dictum the view that an infringement action would not lie when genuine goods were in issue:

> It does appear anomalous in any event that a trademark infringement action would lie here where the soap sold by Interstate is in fact genuine and not spurious. It is conceded that there is no difference between the product sold by DEP and that sold by Interstate. There is no reproduction, counterfeit, copy, or colorable imitation of the Pears mark and hence no public confusion as to the source of goods.

622 F.2d at 622 n. 1 (emphasis added). In the instant case, plaintiff has similarly failed to establish any basis for confusion as to the source of the cancelled goods.

In *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corporation,* 707 F.2d 1054 (9th Cir.1983), the Ninth Circuit relied on the Second Circuit's dictum in the *DEP* case and held that a cause of action for trademark infringement under California law does not lie for the unauthorized sale of genuine goods. In that case, Monte Carlo Shirt, Inc. contracted with Daewoo Industrial Company, Ltd. in South Korea to manufacture men's shirts to its specifications. The shirts bore Monte Carlo's label and packaging. When the shirts arrived in the United States, they were rejected by Monte Carlo for late delivery, which is the same ground upon which plaintiff allegedly rejected the shoes here in issue. Daewoo's United States subsidiary subsequently purchased the shirts and began to sell them with the Monte Carlo labels and packaging intact to discount retailers without Monte Carlo's permission. When Monte Carlo sought to recover damages from Daewoo on the basis of common law trademark infringement, the Court of Appeals affirmed the District Court's dismissal of the trademark claim, stating:

> The goods sold by Daewoo were not imitations of Monte Carlo shirts; they were the genuine product, planned and sponsored by Monte Carlo and produced for it on contract for future sale. The shirts were not altered or changed from the date of their manufacture to the date of their sale, their source was Monte Carlo; the absence of Monte Carlo's authorization of the discount retailers to sell does not alter this.

707 F.2d at 1058. As in *Daewoo*, the CANDIE'S shoes at issue here were originally "planned and sponsored" by El Greco, and the evidence proferred supports the conclusion that they were cancelled by reasons of late delivery only. Although the *Daewood* case interpreted California common law trademark infringement, the case is persuasive that the absence of a trademark holder's authorization to its manufacturer to sell genuine goods cannot constitute trademark infringement under the Lanham Act.

Similar issues were also addressed recently in the case of *Diamond Supply Co. v. Prudential Paper Products Co.,* 589 F.Supp. 470 (S.D.N.Y.1984). There, plaintiff was a wholesale distributor of stationery supplies which sold certain of its goods under the private label "Garden State." Defendant Prudential was a manufacturer of paper goods which sold to wholesalers such as plaintiff and carried out a small amount of retail business as well. At the

time suit was brought, the parties had been doing business together for 25 years. In controversy were plaintiff's private label wire-bound spiral notebooks which Prudential manufactured. Pursuant to a contract between the parties, plaintiff was obligated to purchase surplus private label goods at the end of the year.

In late 1979, Prudential was unable to supply plaintiff with the amount of private label goods it required and plaintiff placed some of its orders with Roaring Springs, Inc., another private brand manufacturer. In the meantime, the relationship between the parties deteriorated. Prudential had offered plaintiff substitute goods which were identical to plaintiff's branded notebooks except for the cover. Plaintiff declined the offer, saying that the goods were unacceptable, and in early 1980, plaintiff's president informed Prudential's president that "he did not care what Prudential did with the Diamond goods still in Prudential's inventory[.]" 589 F.Supp. at 474. Thereafter Prudential discarded any unattached notebook covers still in its possession and either sold or donated to charity a large portion of the volume of completed private labelled notebooks. When plaintiff became aware that defendant Midtown Paper and Supply Company was selling the notebooks, plaintiff filed suit against defendants alleging federal trademark infringement under § 43(a) of the Lanham Act, as well as dilution and unfair competition.

After granting plaintiff's motion for a preliminary injunction and conducting a subsequent bench trial, Judge Duffy dismissed the complaint for failure of proof. Quoting the above cited portion of *Daewoo*, the court stated:

> The essence of the section 1125(a) claim is whether there is any likelihood that the public will be misled or confused .... In the instant case, however, there is no possibility of confusion because the goods sold are not distinct but deceptive-

ly similar goods; rather, they are genuine Diamond goods.

589 F.Supp. at 470 (citation omitted). The Court found that even though there were "minor stylistic differences" between the goods produced by Prudential and Roaring Springs, "the goods were either identical or qualitatively equivalent." *Id.* (footnote omitted).[7] The Court also took note of the fact that Prudential's sale of the notebooks was part of the normal course of its business and had plaintiff sued Prudential for breach of contract, Prudential's sale of the goods might have been required for purposes of mitigation of damages. *Id.* at 476 & n. 12. Noticeably absent in this case is any claim against plaintiff's Brazilian manufacturers, whom plaintiff clearly urges are at fault. One may wonder whether plaintiff simply found it more convenient to sue defendant here on the untenable trademark claim rather than pursue the more difficult course of suing foreign manufacturers.

It is true that the plaintiff in *Diamond Supply* expressly authorized Prudential to do whatever it wanted with the undelivered but private labelled goods, and that there is no equivalent express authorization here. This factor, however, does not alter the determination that the unauthorized sale of genuine goods cannot give rise to the likelihood of confusion necessary to maintain a federal trademark infringement action.

**B. *Unfair Competition***

◼ As stated by the Second Circuit in *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980):

> Although at one time the law of unfair competition was limited to claims that one party had attempted to pass off his goods as those of another party, unfair competition is now held to encompass a broader range of unfair practices which

---

**7.** In this respect the *Diamond Supply* case also resembles the instant case. Here, some of the allegedly unauthorized CANDIE'S shoes sold by Shoe World had plain sock liners, marked with a number that indicated the factory of origin, as compared to the typical CANDIE'S marked sock liner present in most CANDIE'S shoes. Notwithstanding this "minor stylistic difference," plaintiff has not established any inferiority of quality in the goods sold by Shoe World.

may be generally described as a misappropriation of the skill, expenditures, and labor of another.... "[O]ne cannot sell his product by misappropriating the good will of another through misleading the public into thinking it is 'sponsored' by or derived from something else."

609 F.2d at 662 (citations omitted). In an action for unfair competition based on "palming off," however, proof of likelihood of confusion is essential in order for a plaintiff to prevail. *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624 (2d Cir.1983). *See also Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 544, 369 N.E.2d 1162, 399 N.Y.S.2d 628, 631 n. 2 (1977) ("courts have begun to recognize that ... an action for unfair competition turns not upon the acquisition of secondary meaning, but upon whether the acts of the defendant can be characterized as unfair").

█ It is clear from the complaint that plaintiff's unfair competition claim is based upon Shoe World's alleged attempt to pass its goods off as goods manufactured by El Greco. As paragraph 26 of the complaint states:

> Defendant's use of CANDIE'S in connection with footwear has traded upon and appropriated to Defendant the reputation and valuable good will of Plaintiff and has created and continues *to create confusion and mistake on the part of the purchasing public as to the source of Defendant's goods.* In general, Defendant's acts have led and continue to lead the public mistakenly to the belief that defendant's products are in some way sponsored by or associated with Plaintiff and create the impression that Defendant's products are distributed under Plaintiff's aegis and authority. Defendant's activities constitute unfair competition and an infringement of Plaintiff's common law trademark rights.

(emphasis added) [8]. Having found no likelihood of confusion due to the genuine nature of the CANDIE'S shoes here in issue, and therefore no attempt by Shoe World to pass its goods off as goods manufactured by El Greco, plaintiff's common law unfair competition claim must fail.

C. *Dilution*

New York's "antidilution" statute, N.Y. Gen.Bus.L. § 368-d, provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

In contrast to trademark infringement, the antidilution statute is aimed at deterring "injury to a recognized trade name, rather than damage arising from confusion among customers[.]" *Sally Gee, Inc. v. Myra Hogan, Inc., supra*, 699 F.2d at 624 n. 5. *See also Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 544, 369 N.E.2d 1162, 399 N.Y.S.2d 628 (1977) (statute enacted to deter "cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trade-mark or name").

█ A cause of action is established under the antidilution statute by a showing of a truly distinctive trademark and likelihood of dilution. *Sally Gee, Inc. v. Myra Hogan, Inc., supra*, 699 F.2d at 625; *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189 (E.D.N.Y.1983). In *Sally Gee*, the leading case in this Circuit interpreting § 368–d, the court noted that the concept of dilution is "nebulous" and is

---

**8.** The portion of the complaint's demand for relief pertinent to plaintiff's unfair competition claim requests that defendant be restrained from:

> (d) passing off or inducing or enabling others to sell or pass off goods, not of plaintiff's

manufacture, as and for the products of plaintiff; and

> (e) otherwise infringing upon plaintiff's trademark rights in its trade name and trademark CANDIE'S, competing unfairly with plaintiff, injuring its business reputation or diluting the distinctive quality of its trademark.

usually characterized as a "'whittling down' of the identity or reputation of a tradename or mark," 699 F.2d at 625 (citations omitted). While the CANDIE'S mark may be distinctive, plaintiff has offered no proof of dilution of the CANDIE'S mark due to any acts of defendant. Thus, plaintiff's claim under the New York antidilution statute must fail.

### D. *Trademark Infringement under New York Law*

■■■ In order to obtain relief from trademark infringement under N.Y.Gen. Bus.L. § 368–b, a plaintiff must prove that the defendant's use of the allegedly infringing mark is likely to cause confusion or mistake or to deceive the public. *Allied Maintenance Corp. v. Allied Mechanical Trades, supra,* 369 N.E.2d at 1165, 399 N.Y.S.2d at 631. As discussed above, plaintiff has not established that defendant's importation and sale of the genuine CANDIE'S shoes is likely to cause confusion, mistake or deception as to the source of the goods. Therefore, plaintiff cannot state a claim under § 368–b.

### E. *New York General Business Law § 279–n*

■■■ Since the commencement of this action, this statute has been repealed and replaced by identical provisions in N.Y. Arts & Cultural Affairs L. § 33.09. *See* N.Y.Gen.Bus.L. § 279–n, *repealed,* L.1983, c. 876, § 5, eff. Dec. 31, 1983 (McKinney Supp.1983). This statute, which was originally derived from the New York Penal Law, provides that a person who commits any of various "offenses against trademarks" enumerated therein is guilty of a misdemeanor.

· Although this statute provides for a criminal penalty, its predecessor has been construed to permit application for injunctive relief from allegedly criminal conduct directed toward plaintiff's property rights, trademark and good will. *Lanvin Parfums, Inc. v. Le Dans, Ltd.,* 9 N.Y.2d 516, 174 N.E.2d 920, 215 N.Y.S.2d 257, 261, *cert. denied,* 368 U.S. 834, 82 S.Ct. 58, 7 L.Ed.2d 35 (1961), (construing former N.Y. Penal L. § 2354(6), which is identical to

N.Y. Arts & Cult.Affs.L. § 33.09(6)). However, an injunction may not issue based on this statute in the absence of evidence of fraudulent intent to deceive on the part of the defendant. *Girl Scouts of the United States of America v. Personality Posters Mfg. Co.,* 304 F.Supp. 1228, 1234 (S.D.N.Y. 1969). Because plaintiff has not established this element of § 279–n, the statute cannot serve as a basis for injunctive relief.

### F. *Violation of the Customs Statute*

In addition to its federal trademark infringement claim, the cause of action most vigorously argued by plaintiff is its charge that defendant has violated the so-called Genuine Goods Exclusion Act, § 526 of the Tariff Act of 1930, 19 U.S.C. § 1526. The relevant portions of that statute provide:

(a) Except as provided in subsection (d) of this section, it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States, under the provisions of sections 81 to 109 of Title 15, unless written consent of the owner of such trademark is produced at the time of making entry.

 \* \* \* \* \* \*

(c) Any person dealing in any such merchandise may be enjoined from dealing therein within the United States or may be required to export or destroy such merchandise or to remove or obliterate such trademark and shall be liable for the same damages and profits provided for wrongful use of a trademark, under the provisions of sections 81 to 109 of Title 15.

The statute also provides for seizure, forfeiture, destruction and other forms of disposition of the violating goods. 19 U.S.C. § 1526(b) and (e).

Defendant contends that § 1526 is inapplicable to the instant case, or alternative-

ly, that the CANDIE'S shoes are excluded from the coverage of § 1526 pursuant to 19 C.F.R. § 133.21(c)(3). That provision exempts from the restrictions placed on importation of articles bearing recorded trademarks or trade names "articles of foreign manufacture bear[ing] a recorded trademark or trade name applied under authorization of the U.S. owner." As detailed below, I find both of defendant's arguments to be persuasive.

### 1. *Applicability of § 1526*

■ The availability of injunctive relief under § 1526 has in recent years been a significant point of controversy in the so-called "grey goods" cases. Of particular relevance to this case are *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 548 F.Supp. 1063 (E.D.N.Y.1982), *vacated and remanded*, 719 F.2d 42 (2d Cir.1983) (*"Bell & Howell"*); *Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163 (S.D.N.Y.1984) (*"Osawa"*) and *Vivitar Corp. v. United States*, 593 F.Supp. 420 (Ct. Int'l Trade 1984) (*"Vivitar"*). A "grey market" exists when a party other than the owner of a United States trademark seeks to import into this country identically marked goods which were lawfully marked by a foreign owner of the same mark. *Osawa, supra*, 589 F.Supp. at 1164. For example, the United States trademark rights to a particular foreign made product are owned by A, a U.S. corporation, and the non-U.S. trademark rights are held by B, a foreign corporation. Although both A's and B's goods are lawfully trademarked, A may seek to exclude from importation or enjoin the sale of B's goods in the United States, *i.e.*, the area beyond B's trademark rights. B's products are referred to as "grey goods," a name apparently designed to contrast with "black" market, or clearly illegal goods. While grey goods may be lawfully manufactured and marked for distribution within a defined territory, the legality of their sale outside that territory, *i.e.*, in the United States, has been questioned.

Section 1526 was originally enacted in response to the decision of the Second Circuit Court of Appeals in *A. Bourjois & Co. v. Katzel*, 275 F. 539 (2d Cir.1921), *rev'd*,

260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923). In that case, a French concern doing business both in France and in the United States sold its U.S. business, along with its good will and trademarks, to the plaintiff. The trademarks included the names "Java" and "Bourjois" for use on cosmetic face powder manufactured in France. The defendant purchased the same genuine powder in France and imported it into the United States in boxes and with marks closely resembling those of plaintiff.

Based on a theory of trademark infringement, the district court in *Katzel* found that plaintiff was entitled to a preliminary injunction preventing defendant's sale of the French powder in the United States. The Second Circuit vacated the injunction, determining that an infringement action could not lie where the powder sold by defendant was genuine. While *Katzel* was pending in the Supreme Court, Congress enacted § 1526 in response to the Second Circuit's decision, thus forming a basis for reinstating plaintiff's injunction. The Supreme Court reversed the Second Circuit's decision, however, based on a determination that defendant's acts violated certain provisions of the trademark statute. The Court rejected defendant's argument that an action for infringement would not lie, stating:

> It is said that the trade mark here is that of the French house and truly indicates the origin of the goods. But that is not accurate. It is the trade mark of the plaintiff only in the United States and indicates in law, and, it is found, by public understanding, that the goods come from the plaintiff although not made by it. It was sold and could only be sold with the good will of the business that plaintiff bought.... It stakes the reputation of the plaintiff upon the character of the goods.

260 U.S. at 692, 43 S.Ct. at 245.

As will be further discussed below, the *Katzel* case can easily be distinguished from the case at bar. In *Katzel*, the goods imported by defendant were marked and

sold by the foreign manufacturer and trademark holder. Admission of the goods into the United States, therefore, constituted importation of goods whose marks were not authorized by plaintiff, the U.S. mark owner. In the instant case, the evidence supports the conclusion that the application of the CANDIE'S mark was permitted by El Greco, the U.S. markholder. In fact, there has been no mention in this case of any CANDIE'S mark owner, foreign or domestic, other than El Greco. In addition, the plaintiff in *Katzel* "was apparently unconnected with the foreign manufacturer and originator of the trademark, beyond having been the manufacturer's exclusive American distributor and having acquired from it the American trademark rights." *Bell & Howell, supra,* 548 F.Supp. at 1066 (construing defendants' argument). In contrast, plaintiff here was intimately connected with the Brazilian foreign manufacturers, and plaintiff, rather than the Brazilian companies, is responsible for controlling the use of the CANDIE'S trademark.

In the *Bell & Howell* case, the district court was faced with deciding the issue of whether an American trademark owner could enjoin the "unauthorized competitive sale within the United States of the same identically trademarked goods, which were made and placed in the stream of international commerce by the foreign manufacturer, who did *not* intend that such goods be sold here." 548 F.Supp. at 1964–65 (emphasis added). Although set out in greater detail in the district court's decision, *id.* at 1065, 1067, a brief note about the corporate relationship of the parties in *Bell & Howell* is necessary. The goods in controversy in that case were certain types of photographic equipment manufactured in Japan by the Mamiya Camera Co. ("Mamiya"). A Japanese trading company, referred to by the court as Osawa Japan, held the exclusive right to distribute the equipment in all countries except Japan, where Mamiya held those rights. Plaintiff was the registered owner of three versions of the MAMIYA

trademark in the United States, and purchased its goods from Osawa Japan.

Defendant Masel Supply Co. and another company (referred to collectively as "defendants") were American companies which sell photographic equipment at discount prices. Defendants imported into the United States and sold non-counterfeit MAMIYA equipment which was purchased from some source other than plaintiff. The goods were indisputably manufactured by Mamiya and distributed by Osawa Japan. Plaintiff neither consented to nor authorized defendants' importation or sale of the goods. The evidence demonstrated that the goods imported and sold by defendants, although identical to those sold by plaintiff, differed substantially from plaintiff's goods in that the former lacked warranties and English language instruction booklets, and were not packaged in the same manner or advertised to the same extent as were plaintiff's goods. 548 F.Supp. at 1069.

In considering plaintiff's application for injunctive relief, the district court in *Bell & Howell* emphasized the trademark concept of "goodwill," *id.,* and determined that although plaintiff's and defendants' goods were identical and genuine, the goodwill identified with their goods differed. *Id.* at 1079.[9] Finding that there would be a substantial likelihood of confusion caused by defendant's use of the MAMIYA mark on the photographic equipment in question, the court issued a preliminary injunction.

On appeal, the Second Circuit vacated the injunction, finding an absence of evidence to support the trial court's conclusion that there existed a substantial likelihood of confusion. 719 F.2d at 46. The court stated:

> Whether irreparable injury exists is a determination to be made in the first instance by the district court. On the basis of the present record, *irreparable injury may well not be present herein since there would appear to be little confusion, if any, as to the origin of the*

9. The *Bell & Howell* court found that while plaintiff's use of the MAMIYA mark within the United States signified certain warranties and

assurances of quality, "[d]efendant's use of those marks carries none of these assurances." 548 F.Supp. at 1079.

*goods* and no significant likelihood of damage to [plaintiff's] reputation since *thus far it has not been shown that Masel's goods, are inferior* to those sold by [plaintiff] and are injuring [plaintiff's] reputation.

*Id.* (emphasis added). The appellate court did not address or review the district court's discussion of § 1526.

Although the plaintiff here urges that the district court's opinion in *Bell v. Howell* supports a broad application of § 1526 and supports plaintiff's position in the instant case, *see, e.g.*, plaintiff's post-trial memorandum at 49 & nn. 25–26, I am not so persuaded for several reasons. First, the circuit court vacated and remanded *Bell & Howell.* Second, the district court more clearly granted the injunction based upon trademark law, 548 F.Supp. at 1079, rather than interpreting § 1526 in a way that would be applicable to the case at bar.

In addition, the corporate structure of plaintiff and the nature of its relationship to the foreign corporations involved were also relevant to the *Bell & Howell* court's decision, which was concerned with the antitrust and customs implications arising where an "international enterprise" is concerned. *See, e.g., id.* at 1077–79. Section 133.21(c) of the regulatory exemption from § 1526, which is relevant here, was not implicated at all in *Bell & Howell.* Exemptions dealing with the corporate relationship between the plaintiff and the foreign corporations, however, were of concern to the court. *See* 19 C.F.R. § 133.21(c)(1) and (2); 548 F.Supp. at 1078–79. Finally, the trademarks of the goods at issue in *Bell & Howell* were owned by separate entities—

the plaintiff and the foreign trademark owners—the latter of which in some way distributed the goods to the defendants in that case. Each mark holder had separate access to Osawa Japan, the holder of worldwide (except Japan) distribution rights. Each mark owner would thus be able to obtain genuine MAMIYA goods via a different channel. In contrast here, El Greco is the sole holder of the CANDIE'S mark, and was therefore the only possible source of origin of genuine CANDIE'S shoes here in issue. In fact, the circuit court's determination in *Bell & Howell* that irreparable injury might well not have been present due to the apparent lack of confusion as to the origin of the goods, *supra* at 1398, is applicable here, as the goods sold by Shoe World originated with El Greco.

Plaintiff also contends that the *Osawa* case, decided after the hearing in this case, supports its request for injunctive relief. The plaintiff there was the same party that had been the plaintiff in *Bell & Howell,* and it sought a preliminary injunction preventing defendants, who were also discount camera dealers, from advertising and dealing in goods with the MAMIYA mark.[10] Judge Leval issued the injunction based on a determination that an infringement action could lie for the unauthorized sale of genuine goods marked abroad. 589 F.Supp. at 1170–71. Distinguishing the circuit court's decision in *Bell & Howell,* the *Osawa* court found an "abundance" of evidence demonstrating irreparable harm to the plaintiff. *Id.* at 1168. The plaintiff met its burden of proof by establishing that defendants' acts had resulted in a drastic decline in plaintiff's sales—which in turn caused plaintiff

---

**10.** The *Osawa* court set forth several comparisons between plaintiff's and defendants' marketing practices with respect to the goods in issue. Plaintiff, for example, always maintained a full stock of peripheral equipment to be used with the MAMIYA cameras, whereas defendants could not establish that they did so. Plaintiff gave training seminars for MAMIYA users, dealers and potential customers and sometimes gave rebates on merchandise. Plaintiff authorized camera dealers to sell its trademarked goods only if they would agree to have an extensive supplier/dealer relationship and provide appropriate protection when handling the goods, as

well as free warranty repairs and user training. In addition, plaintiff's advertising emphasized the quality of MAMIYA-marked goods.

The advertising of defendants, in contrast, emphasized the cheap price of the marked goods, which was often less than the price at which plaintiff sold to retailers. Defendants used a lesser degree of care in inspecting and handling the goods and provided no warranty service. Plaintiff was therefore forced to provide warranty service for goods sold by defendants in order to protect the reputation of the MAMIYA mark. 589 F.Supp. at 1165–67.

to lay off a large number of personnel, delays in warranty service,[11] slashing of plaintiff's advertising budget and problems with plaintiff's authorized dealers. *Id.* As in *Bell & Howell,* the goods in *Osawa* were lawfully marked abroad by the foreign owner of the MAMIYA mark, which, as set out above, differs significantly from the situation in this case. In addition, the plaintiff here has not demonstrated any of the harm which plaintiff in *Osawa* established.

The *Osawa* court's discussion of § 1526 is also not helpful to this plaintiff. Unlike the plaintiff here, plaintiff *Osawa* had sought and was granted by the U.S. Customs Service an order of exclusion barring the defendants' allegedly unauthorized importation of MAMIYA goods. 589 F.Supp. at 1165. Thus, although it found that an injunction should also issue under § 1526, that determination was not necessary to the court's decision. Rather, the more narrow question before the court was whether Customs violated its own regulations in granting plaintiff the exclusion order. *Id.* at 1177. In addition, like the *Bell & Howell* court, the *Osawa* court was concerned with the corporate relationship between the plaintiff and the foreign mark holder, a matter not relevant to this case.

The recent case of *Vivitar Corp. v. United States, supra,* presents in exhaustive detail the legislative and practical history of § 1526 and persuasively supports Shoe World's argument that the statute is inapplicable to this case. In *Vivitar,* the plaintiff owned the United States rights to the VIVITAR trademark and licensed foreign manufacturers to apply that mark to various types of photographic equipment. Plaintiff's wholly-owned subsidiaries marketed such goods outside the United States, but were not licensed to do so within this country. It was undisputed that third parties unrelated to plaintiff were importing into the United States trademarked goods made by plaintiff's foreign manufacturers without plaintiff's consent.

Plaintiff Vivitar brought a declaratory judgment action seeking a declaration that pursuant to § 1526, Customs must bar from importation goods with plaintiff's trademark that are brought to the United States without plaintiff's consent. The court necessarily dealt with customs regulation § 133.21(c)(3), at issue here, in determining that plaintiff was not entitled to relief. Finding that the literal language of § 1526 would support plaintiff's request to bar grey goods, the *Vivitar* court nevertheless determined that "longstanding administrative practice and Congressional ratification" mandated that the scope of § 1526 be construed more narrowly. 593 F.Supp. at 425. Judge Restani determined that the enactment and history of § 1526 require the statute to apply only to the "evil it was designed to remedy," namely, the situation created by the Second Circuit's decision in *Bourjois v. Katzel, supra.* 593 F.Supp. at 434, *citing Church of the Holy Trinity v. United States,* 143 U.S. 457, 463, 12 S.Ct. 511, 513, 36 L.Ed. 226 (1892). Judge Restani stated:

> [T]he sponsors of § 1526(a) repeatedly stated that the purpose of the section was only to reverse the *Katzel* decision. As shown by the legislative history, *Congress adopted § 1526(a) to protect an American trademark owner,* like the one in *Katzel,* who *had purchased the trademark of an independent foreign company.* Congress decided it was unfair to permit unauthorized imports of goods bearing the foreign company's trademark. These imports violated the rights the American trademark owner purchased from the foreign company in an arms-length transaction. This is the problem Congress was confronted with by the *Katzel* decision, and the sole purpose of § 1526(a) was to resolve this problem.

593 F.Supp. at 434 (emphasis added).

The *Vivitar* court's thorough analysis of § 1526 and that statute's history make

---

**11.** Such delays were attributable to providing service for defendants' unwarranted goods. *See supra* note 10.

clear that the statute is inapplicable to this case, where the plaintiff did not obtain trademark rights from a foreign mark owner and in fact was the sole source of genuine CANDIE'S trademarked shoes.[12]

### 2. *Applicability of 19 C.F.R. § 133.-21(c)(3)*

As discussed above, I find that § 1526 does not provide a basis for granting plaintiff injunctive relief. Even if that statute were applicable, I would find that plaintiff's request for injunctive relief is barred by 19 C.F.R. § 133–21(c)(3), *supra* at 1396–1397. With regard to the Style No. 4666 shoes, the evidence amply demonstrates that plaintiff authorized Solemio's application of the CANDIE'S mark as well as the completion of the goods, even though it eventually cancelled those goods. *See, e.g.,* Tr. 152, 173–74. As to the other types of shoes in issue, plaintiff has not met its burden of proving that the manufacturers' application of the CANDIE'S mark was unauthorized.

For the reasons set forth above, plaintiff has not succeeded on the merits of its claims.

### G. *Balance of Equities*

■ As has been discussed at length, plaintiff has not succeeded on the merits of any of its claims against defendant. Even had plaintiff proven any of its claims, I would find that the balance of equities does not favor the issuance of a permanent injunction. *See supra* at 1389–1390.

Plaintiff has not demonstrated that the harm which defendant is alleged to have caused would be repeated in the future. In order for injunctive relief to be appropriate, "[t]he necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.,*

345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). Plaintiff has not made this showing, and it is likely that plaintiff itself could prevent any future unauthorized disposition of its trademarked goods by exercising sufficient control over its foreign manufacturers when it cancels marked goods. Furthermore, as plaintiff alleges that the Brazilian manufacturers improperly disposed of the shoes in issue, it is quite possible that plaintiff has an adequate legal remedy against these manufacturers for any contract damage it may prove. It is "the absence of an adequate remedy at law, which is the sine qua non for the grant of [injunctive] relief." *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981).

In addition, on the same day that plaintiff's president telephoned defendant's president to complain about defendant's sale of allegedly counterfeit shoes, plaintiff's own salesperson had offered to sell the same shoes to defendant's representative. Tr. 278, 327–28, 331–32, 363–68; Defendant's Exh. BB; *see supra* at 1387, 1389. Given that factor alone, the plaintiff could hardly claim significant equities tipping the balance in its favor.

### III. CONCLUSION

For the reasons set forth above, I find that plaintiff is not entitled to a permanent injunction.

SO ORDERED.

---

**12.** Defendant Shoe World has also suggested that § 1526 may not be applicable here because the CANDIE'S goods were not seized by Customs. *See Windsor Industries, Inc. v. U.S. Diamond Imports,* 549 F.Supp. 415, 417 n. 2 (S.D.N.Y.1982) (§ 1526 deemed inapplicable until after seizure of infringing goods). As the *Windsor*

case concerned a motion to dismiss due to improper venue, the court did not discuss how it arrived at that conclusion, nor is that result required anywhere in § 1526. Because I have found § 1526 inapplicable to this case even absent a seizure by Customs, I need not address defendant's contention.